Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:   (619) 826-8065

Grace Jun, Esq., SBN 287973
grace@gracejunlaw.com
Grace Jun Law PC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 841-1408

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF CALLEN LINES, by and through its to-be-appointed special administrator, TAYLOR JONES; R.G.L. and E.M.L., individually, by and through their guardian *ad litem*, TAYLOR JONES; RICHARD G. LINES III, individually, and DANIEL MCCARTHY, individually,<br><br>                               Plaintiffs,<br><br>       v.<br><br>COUNTY OF SAN DIEGO; NHI NGOC DAI, JARELL SANCHEZ, JILLAINE SMASAL-KWAK, OWEN GAMBIZA, KELLY MARTINEZ; THERESA ADAMS; CHRISTOPHER BUCHANAN; KYLE BIBEL; JON MONTGOMERY, D.O; SERINA ROGNLIEN-HOOD; NAPHCARE, INC.; NAPHCARE OF SAN DIEGO, LLC; CORRECTIONAL HEALTHCARE PARTNERS, PETER FREEDLAND, AND DOES 1-15, inclusive,<br><br>                               Defendants | Case No.  **'25CV3856 LL   KSC**<br><br>**COMPLAINT FOR:**<br><br>**1. 14TH AMENDMENT –OBJECTIVE INDIFFERENCE TO A SERIOUS MEDICAL NEED**<br><br>**2. 14TH AMENDMENT –INADEQUATE MEDICAL AND MONITORING POLICIES *MONELL* CLAIM**<br><br>**3. 14TH AMENDMENT – FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE (*MONELL* AND INDIVIDUAL SUPERVISORY LIABILITY)**<br><br>**4. 14TH AMENDMENT –DEPRIVATION OF FAMILIAL ASSOCIATION**<br><br>**5. BANE ACT – Civil Code § 52.1**<br><br>**6. NEGLIGENCE AND WRONGFUL DEATH – CCP §§ 377.30 and 377.60**<br><br>**JURY TRIAL REQUESTED** |

# I.

# FACTUAL BACKGROUND

1.    Callen Lines (herein "Ms. Lines" or "Callen") was a beloved wife, mother and daughter who struggled with addiction. Ms. Lines was intelligent and deeply compassionate. Her love for the elderly and rescuing wounded animals motivated her to work in healthcare as a nursing assistant. Callen's greatest passion in life was her family.



2.    Callen was 31 years old when she was discovered unresponsive in her cell at Las Colinas Detention Center. She died on May 12, 2025. According to the Medical Examiner's report, Callen Lines died due to fentanyl and methamphetamine toxicity.

3.    When Ms. Lines was booked into custody and assessed by the intake nurse, she was honest and upfront about her addiction issues. Ms. Lines told the nurse that she was a daily fentanyl and alcohol user. The intake nurse noted that Callen also abused other drugs and had tested positive for amphetamines and methamphetamine. Callen's medical records with the Sheriff's Department further noted she regularly abused methamphetamine.

4.    Callen further informed staff that she had a history of suffering from severe withdrawals. She also informed staff that two weeks prior, while in County custody, she suffered from serious withdrawals, including seizures, and was urgently transported to the emergency room.

5.    Callen was placed on the Jail's withdrawal protocol, which required medical staff to perform frequent screening assessments to track and monitor worsening signs and symptoms of withdrawal and to administer certain medications to treat withdrawal. But as detailed below, Ms. Lines did not receive timely screening assessments or lifesaving medication.

3

COMPLAINT

6.      The abysmal failures to act leading to Ms. Lines' death, however, do not end with the medical staff at the Las Colinas Detention Facility.

7.      As detailed below, according to inmate witnesses, in the hours leading up to her death, Ms. Lines screamed and begged for help, stating several times that she could not breathe and needed urgent medical attention. She activated the intercom button on at least four occasions, stating, at one point, that she was seizing, and at another point that she was vomiting. In response to these intercom calls, DOE deputies called her a "liar" and terminated the calls. Her final intercom call stated she was going to pass out and needed medical help. In response to this intercom call, deputies told her to "sit down." According to Ms. Lines' cellmate, Ms. Lines sat down right in front of the cell door window. When the DOE deputy performed the next safety cell check, Ms. Lines begged him to stop and speak with her. The DOE deputy never stopped and continued to ignore Ms. Lines. Hours later, Callen was discovered dead. According to the cellmate, Callen was "purple and blue."

8.      Callen Lines's death was not an isolated incident, but part of a pattern of deaths resulting from the County's constitutionally deficient practices related to treatment of alcohol and drug intoxication and withdrawal.

9.      Prior to Ms. Lines's death, the County of San Diego maintained official policies, longstanding customs, and widespread practices governing the management of alcohol and drug intoxication and withdrawal that were constitutionally deficient. The County had actual and constructive notice that these policies and practices posed a substantial risk of serious harm and preventable death, and they were the moving force behind the violations of Ms. Lines's constitutional rights.

10.     For instance, over eight years before Callen's death, in January 2017, the National Commission on Correctional Health Care (NCCHC), a nationwide licensing and accreditation agency for medical services within jails and prisons,

issued a report to the Sheriff's Department detailing specific deficiencies and failures to comply with NCCHC standards.  Relevant to this case, the NCCHC noted the Sheriff's Department failed to comply with national standards for treatment of alcohol and drug intoxication and withdrawal because it had not instituted the use of validated scoring scales, including the Clinical Opiate Withdrawal Scale (COWS) and Clinical Institute Withdrawal Assessment - Alcohol (CIWA-A), or CIWA-A revised (CIWA-Ar).

11.    Almost six years before Ms. Lines's death, on November 11, 2019, Elisa Serna died from untreated alcohol and drug withdrawal at the Las Colinas Detention Center. Similarly, in July of 2022, three years before Ms. Lines' death, Vianna Granillo also died from untreated alcohol and drug withdrawals. As of November 2022, the Sheriff's Department had still not meaningfully instituted COWS and CIWA-Ar to monitor the progression and severity of drug and alcohol withdrawal of inmates.

12.    Like Ms. Lines, Ms. Serna and Ms. Granillo reported at medical screening and intake that they abused opioids and alcohol.  Like Ms. Lines, Ms. Serna and Ms. Granillo further reported that they had a history of suffering from withdrawal.  Despite this information, Ms. Serna and Ms. Granillo went without treatment for drug and alcohol withdrawal for five days.  Ms. Serna and Ms. Granillo requested medical assistance for their withdrawal symptoms but received no help.

13.    Similar to the facts in this case, Ms. Serna suffered multiple seizures and falls in full view of Sheriff's Department nurses and deputies.  Instead of offering Ms. Serna assistance, nurses and deputies called Ms. Serna a "faker," malingerer, and a person who sought "secondary gain."  They accused Ms. Serna of "nurse shopping" because she repeatedly requested medical assistance from multiple people.  This egregious denial of medical care to Ms. Serna resulted in criminal prosecutions of a doctor, Frederike Von Lintig, and a nurse, Danalee

5

COMPLAINT

Pascua, for manslaughter. The California Medical Board instituted proceedings to revoke the license of the two doctors, Von Lintig and Carol Gilmore, tasked with Ms. Serna's care.

14. Moreover, the Sheriff's Department does not have any protocols in place to identify, monitor, and treat individuals suffering from stimulant intoxication and withdrawal. The initial clinical examination of a person suspected to be in simulant intoxication or withdrawal should include a clinical interview, physical examination, observation of signs, documentation of patient-reported symptoms, review of other available information, and a safety assessment of the patient's risk of harm to self and others. Callen Lines was never examined or monitored for stimulant intoxication and/or withdrawal.

15. According to the expert report of Dr. Kelly Ramsey, an addiction medicine specialist and physician, in the *Darryl Dunsmore et al. v. County of San Diego* class action case (S.D. Cal. case no. 20-cv-00406-AJB-DDL), data from the Sheriff's Department showed that in the third quarter of 2023, roughly half of urine drug screens at jail intake resulted in a positive urine toxicology test for stimulants.

16. Although treating inmates who are at risk of harm due to stimulant intoxication and/or withdrawal is a frequent and recurring situation at the San Diego County Jails, the Sheriff's Department does not have any protocol or procedure in place to monitor and treat such individuals.

17. Three years before Ms. Lines's death, in February 2022, the California State Auditor issued a scathing report regarding the disproportionately high rate of San Diego County jail deaths. The Auditor found that San Diego County jails had the most in-custody deaths in California. The Auditor found the County "failed to adequately prevent and respond to the problem and called for legislative action" to force the County to incorporate nationally recognized standards to prevent foreseeable deaths.

18. The report stated, "The high rate of death in San Diego County jails

6

COMPLAINT

compared to other counties raises concerns and suggests that **underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody."** After a thorough inspection of the jail and an audit of its policies, the Auditor concluded, **"significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."**

19.     Accordingly, in addition to the individual Defendants identified herein, Plaintiffs also bring this action against Defendants who were the highest-ranking officials within the Sheriff's Department, Naphcare, Naphcare of San Diego LLC, and Correctional Healthcare Partners. These entities were responsible for monitoring and overseeing every aspect of the custody and care of inmates within San Diego County jails, especially regarding the provision to medical care inside the jails.  Each of these officials were aware of the following because they worked at/for the Sheriff's Department during these time periods and received information regarding the following: the denial of adequate drug and alcohol intoxication and withdrawal treatment for Ms. Lines, causing her horrific death; the report of the NCCHC noting the failure of the Sheriff's Department to implement withdrawal and intoxication protocols that met national standards; and details regarding the deaths of other inmates who did not receive treatment for substance withdrawal, such as Ms. Serna and Ms. Granillo.  Despite their knowledge, Defendants failed to promulgate adequate protocols for the monitoring and treatment of drug and alcohol intoxication and withdrawal.  They further failed to properly train, supervise, and discipline their subordinates regarding identification of alcohol and drug intoxication and withdrawal, and proper treatment of such conditions.

20.     In sum, based on the failures of the individual defendants named herein, as well as the systemic failures of the County in maintaining constitutionally inadequate withdrawal polices and training, Ms. Lines' husband (Richard Lines, III), minor children (R.G.L. and E.M.L.) (acting through their Guardian *Ad Litem,*

Taylor Jones (Callen Lines' sister), and Callen's father (Daniel McCarthy) bring this lawsuit for causing Ms. Lines' premature death.

## II.

## JURISDICTION AND VENUE

21. This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983. The Jurisdiction of this court is invoked pursuant to 28 U.S.C. section 1331. State law claims are alleged as well, over which Plaintiffs invoke the Court's supplemental jurisdiction.

22. This case is instituted in the United States District Court for the Southern District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices, work, and/or reside.

23. Pursuant to the California Government Code, Plaintiffs filed their respective tort claims with the County of San Diego based on the foregoing incident on October 2, 2025. The County has not responded to Plaintiffs' claims. Pursuant to California Government Code § 912.4, if the County fails or refuses to act within 45 days, the claims are deemed rejected by operation of law. Accordingly, the claims were deemed rejected on November 16, 2025. Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

24. At the time of Ms. Lines's suffering and premature death, Ms. Lines had not been convicted or pled guilty to any crime. In fact, she had not yet been arraigned. Accordingly, Ms. Lines was a pretrial detainee at the time she prematurely died.

## III.

## THE PARTIES

25. At all times relevant to this complaint, Ms. Lines was a resident of San Diego County in the State of California and a citizen of the United States. She died

COMPLAINT

in-custody at Las Colinas Detention Center (LCDC), which is in the County of San Diego, and owned and operated by the SAN DIEGO COUNTY SHERIFF'S DEPARTMENT ("Sheriff's Department"), an agency of the COUNTY OF SAN DIEGO ("County"). Decedent Callen Lines is represented by and through her successor in interest, her husband, RICHARD G. LINES, III. (*See* Declaration of Richard G. Lines, III, filed concurrently with this Complaint.) A probate petition to appoint Taylor Jones, Callen Lines's sister, as the special administrator of the Estate of Callen Lines is currently pending.

26.     E.G.L. and R.G.L. are Ms. Lines' minor children. E.G.L. and R.G.L., are acting by and through their Guardian *Ad Litem,* Taylor Jones. (*See* Declaration of Taylor Jones.) At all times relevant to this Complaint, E.G.L. and R.G.L. resided in the County of San Diego.

27.     Richard G. Lines, III is Ms. Lines' husband. He brings his claim individually. At all times relevant to this Complaint, Richard Lines resided in the County of San Diego.

28.     Daniel McCarthy is Ms. Lines' father. He brings his claim individually. At all times relevant to this Complaint, Daniel McCarthy resided in the County of San Diego.

29.     Defendant County of San Diego ("County") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Diego County citizens. At all times mentioned herein, Defendant County was responsible for overseeing the operation, management, and supervision of the San Diego County jails such as Las Colinas (LCDC), as well as its Corrections Deputies, Medical Staff, and inmates. The County is also responsible for developing, implementing, and amending jail medical policies, procedures, and training. The County has a non-delegable duty to provide adequate medical care and cannot contract out that obligation to third-party medical groups. The County

COMPLAINT

owned, operated, funded, and controlled the San Diego County Sheriff's Department.

30.   Defendant Nhi Ngoc Dai worked as a medical provider at Los Colinas during all times relevant to this Complaint and performed the wrongful acts alleged in this Complaint while under her course and scope.  Based on information and belief, Defendant Dai is/was an employee or independent contractor of NAPHCARE, INC., and/or NAPHCARE OF SAN DIEGO, LLC (collectively, "Naphcare") and/or CORRECTIONAL HEALTHCARE PARTNERS (CHP) during all times relevant to this Complaint. Based on information and belief, Defendant Dai lives in the County of San Diego at all times mentioned herein and committed the culpable acts against Ms. Lines in the County of San Diego.

31.   Defendant Jarell Sanchez worked as medical personnel at Las Colinas during all times relevant to this Complaint and performed the wrongful acts alleged in this Complaint while under her course and scope. Based on information and belief, Defendant Sanchez is/was an employee of the County. Based on information and belief, Defendant Sanchez lives in the County of San Diego at all times mentioned herein and committed the culpable acts against Ms. Lines in the County of San Diego.

32.   Defendant Jillaine Smasal-Kwak worked as medical personnel at Las Colinas during all times relevant to this Complaint and performed the wrongful acts alleged in this Complaint while under her course and scope. Based on information and belief, Defendant Smasal-Kwak is/was an employee of the County. Based on information and belief, Defendant Smasal-Kwak lives in the County of San Diego at all times mentioned herein and committed the culpable acts against Ms. Lines in the County of San Diego.

33.   Defendant Owen Gambiza worked as medical personnel at Las Colinas during all times relevant to this Complaint and performed the wrongful acts alleged in this Complaint while under her course and scope. Based on information and

10

COMPLAINT

belief, Defendant Gambiza is/was an employee of the County. Based on information and belief, Defendant Gambiza lives in the County of San Diego at all times mentioned herein and committed the culpable acts against Ms. Lines in the County of San Diego.

34.    At all times relevant to this complaint, Naphcare, Inc. and/or Naphcare of San Diego, LLC, (collectively "Naphcare") was a third-party contractor responsible for providing medical and mental health services to inmates in the custody of the San Diego County Sheriff's Department.

35.    At all times relevant to this complaint, Correctional Healthcare Partners (CHP) was another third-party subcontractor responsible for providing medical services to inmates in the custody of the San Diego County Sheriff's Department, including withdrawal management.

36.    At all times relevant to this complaint, Dr. Peter Freedland was the owner/program manager/health services administrator at CHP, who was responsible for ensuring implementation of NCCHC compliant policies at San Diego County jails, including a protocol for treatment of alcohol and drug withdrawal that complied with NCCHC standards.

37.    At all times relevant to this complaint, DOES #1-4 were correctional deputies, working on May 11, 2025 or May 12, 2025. Each DOE defendant knew Ms. Lines was suffering from severe withdrawals and were directly responsible for the care, oversight, safety, and wellbeing of Ms. Lines while she was detained at LCDF. DOES #1-4 had a duty to summon medical care and perform safety checks to ensure the medical safety of Ms. Lines.

38.    At all times relevant to this complaint, DOES #5-10 were medical providers, working on May 11, 2025 or May 12, 2025. Each DOE defendant knew Ms. Lines was suffering from severe withdrawals and were directly responsible for the medical care, management, treatment, safety, and wellbeing of Ms. Lines while she was detained at LCDF. DOES #5-10 had a duty to provide adequate medical

11

COMPLAINT

care and management based on Ms. Lines' serious medical needs.

39.    At all times relevant to this complaint, DOES #11-15 were supervisory officials that oversaw all detention and medical facilities owned and operated by the Sheriff's Department. DOES #11-15 were responsible for management and oversight of the MSD, including implementing adequate withdrawal policies as well as supervising, training, and overseeing employees and independent contractors working at the jails. Based on information and belief, DOES #11-14 reported directly to Martinez or Adams. DOES #11-14 committed the culpable acts against Ms. Lines in the County of San Diego.

40.    DOE #15 was the program manager/health services administrator at Naphcare, Inc. and/or Naphcare of San Diego, LLC, who was responsible for ensuring implementation of NCCHC compliant policies at San Diego County jails, including a protocol for treatment of alcohol and drug withdrawal that complied with NCCHC standards.

41.    Because Plaintiffs cannot yet conduct discovery regarding the identity of the deputies, nurses, and supervisors that knew Ms. Lines was in need of immediate medical care, (or should have known based on previous policy and training failures, and preventable deaths) the names of the other individual Sheriff's deputies, medical staff, and supervisors who are responsible for monitoring, treating, and preventing Ms. Lines's severe medical condition (and for failing to summon care) are currently unknown to Plaintiffs.  As such, these individuals are sued herein as DOES, and generally referred to herein as DOES, or in the context of specific allegations, are also referred to as "DOE Deputies," "DOE Medical Providers," and "DOE Supervisors."

42.    The true names and capacities whether individual, corporate, associate or otherwise, of defendants named herein as #DOES 1-15 are unknown to Plaintiffs, who therefore sue said defendants by said fictitious names.  Plaintiffs will amend this complaint to show said Defendants' true names and capacities

12

COMPLAINT

when the same have been ascertained.  Plaintiffs are informed and believe and thereon allege that all defendants sued herein as DOES are in some manner directly responsible, and/or conspired together, for the acts and injuries alleged herein.

43.    At all times mentioned herein Defendants named as DOES #1-15 were employees and/or independent contractors of Defendant San Diego County and in doing the acts hereinafter described conspired together and acted within the course and scope of their employment.  The acts of all Defendants and each of them were also done under the color and pretense of the statutes, ordinances, and regulations of the County of San Diego and the State of California.  In committing the acts and/or omissions alleged herein, or conspiring to commit the actions or inactions, all Defendants acted under color of authority and/or under color of law.  Plaintiffs sue all public employees named as Defendants in their individual capacities.

## IV.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

**A.    The Death of Callen Lines**

44.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

45.    On May 11, 2025, Ms. Lines was arrested and booked into Los Colinas at approximately 2:00 p.m.

46.    At 2:26 p.m., during intake, Ms. Lines was honest and upfront with the intake nurse, Marybel Labastill. Ms. Lines informed staff that she abused alcohol and fentanyl on a daily basis and would be suffering from withdrawals. Ms. Lines informed the nurse that she suffers from severe withdrawals, including seizures, and that two weeks prior, while in County custody, she was sent to the Emergency Room because she began suffering from withdrawal-related seizures. Ms. Lines admitted the last drink she had was "last night" and the last time she used fentanyl was that morning at 9:00 am. Ms. Lines further reported that she abused fentanyl daily and used 1 gram of fentanyl.

COMPLAINT

47.     Ms. Lines further provided a urine sample for drug screening. The intake nurse, Marybel Labastill, noted that Ms. Lines abused other drugs and tested positive for fentanyl, THC, amphetamine, MDMA, and methamphetamine.

48.     This was not the first time Ms. Lines has been detained at a San Diego County jail.  On prior occasions, Ms. Lines was noted to abuse methamphetamine and fentanyl. Previously, Ms. Lines was administered withdrawal medications immediately upon booking.  Ms. Lines's medical history was set forth in her jail medical file and was accessible to each nurse and medical provider.  Based on information and belief, each nurse and medical provider that interacted with Ms. Lines reviewed her medical chart and was aware of Ms. Lines's medical history regarding alcohol and opiate withdrawal.

49.     For decades before the death of Ms. Lines, medical organizations such as the American Society of Addiction Medicine (ASAM) and the Substance Abuse and Mental Health Services Administration (SAMHSA) recommended the use of quantification, or scoring, tools for monitoring alcohol and drug withdrawal.  The most widely accepted and used scoring scales include COWS and CIWA-Ar. COWS (for opioid withdrawal) and CIWA-Ar (for alcohol withdrawal) allow medical providers to objectively assess the severity and progression of withdrawal symptoms over time.  The scale helps medical providers recognize when withdrawal is progressing to more advanced stages, which will then require transfer of an inmate-patient to a higher level of care, such the emergency department.  The Clinical Opiate Withdrawal Scale (COWS) is an 11-item scale that can be used to score symptoms of opiate withdrawal and monitor these symptoms over time. COWS and CIWA-Ar appear as follows, respectively:

14

COMPLAINT

50.    **COWS Scoring Sheet:**

| | |
|---|---|
| Patient's Name:_____ | Date and Time ___/___/___:_____ |

Reason for this assessment:_____

| | |
|---|---|
| **Resting Pulse Rate:** _____beats/minute<br>   *Measured after patient is sitting or lying for one minute*<br>0 pulse rate 80 or below<br>1 pulse rate 81-100<br>2 pulse rate 101-120<br>4 pulse rate greater than 120 | **GI Upset:** *over last* 1/2 *hour*<br>0 no GI symptoms<br>1 stomach cramps<br>2 nausea or loose stool<br>3 vomiting or diarrhea<br>5 multiple episodes of diarrhea or vomiting |
| **Sweating:** *over past* 1/2 *hour not accounted for by*<br>   *room temperature or patient activity.*<br>0 no report of chills or flushing<br>1 subjective report of chills or flushing<br>2 flushed or observable moistness on face<br>3 beads of sweat on brow or face<br>4 sweat streaming off face | **Tremor** *observation of outstretched hands*<br>0 no tremor<br>1 tremor can be felt, but not observed<br>2 slight tremor observable<br>4 gross tremor or muscle twitching |
| **Restlessness** *Observation during assessment*<br>0 able to sit still<br>1 reports difficulty sitting still, but is able to do so<br>3 frequent shifting or extraneous movements of legs/arms<br>5 unable to sit still for more than a few seconds | **Yawning** *Observation during assessment*<br>0 no yawning<br>1 yawning once or twice during assessment<br>2 yawning three or more times during assessment<br>4 yawning several times/minute |
| **Pupil size**<br>0 pupils pinned or normal size for room light<br>1 pupils possibly larger than normal for room light<br>2 pupils moderately dilated<br>5 pupils so dilated that only the rim of the iris is visible | **Anxiety or Irritability**<br>0 none<br>1 patient reports increasing irritability or anxiousness<br>2 patient obviously irritable or anxious<br>4 patient so irritable or anxious that participation in<br>   the assessment is difficult |
| **Bone or Joint aches** *If patient was having pain*<br>   *previously, only the additional component attributed*<br>   *to opiates withdrawal is scored*<br>0 not present<br>1 mild diffuse discomfort<br>2 patient reports severe diffuse aching of joints/muscles<br>4 patient is rubbing joints or muscles and is unable to sit<br>   still because of discomfort | **Gooseflesh skin**<br>0 skin is smooth<br>3 piloerrection of skin can be felt or hairs standing up<br>   on arms<br>5 prominent piloerrection |
| **Runny nose or tearing** *Not accounted for by cold*<br>   *symptoms or allergies*<br>0 not present<br>1 nasal stuffiness or unusually moist eyes<br>2 nose running or tearing<br>4 nose constantly running or tears streaming down cheeks | Total Score _____<br>The total score is the sum of all 11 items<br><br>Initials of person<br>completing assessment: _____ |

Score: 5-12 = mild; 13-24 = moderate; 25-36 = moderately severe; more than 36 = severe withdrawal

2

COMPLAINT

51. **<u>CIWA-AR Scoring Sheet and Treatment Guidelines</u>**:

| **Assessment Protocol**<br>a. Vitals, Assessment Now.<br>b. If initial score ≥ 8 repeat q1h x 8 hrs, then if stable q2h x 8 hrs, then if stable q4h.<br>c. If initial score < 8, assess q4h x 72 hrs. If score < 8 for 72 hrs, d/c assessment. If score ≥ 8 at any time, go to (b) above.<br>d. If indicated, (see indications below) administer prn medications as ordered and record on MAR and below. | **Date** | | | | | | | | | | | |
| | **Time** | | | | | | | | | | | |
| | **Pulse** | | | | | | | | | | | |
| | **RR** | | | | | | | | | | | |
| | **O$_2$ sat** | | | | | | | | | | | |
| | **BP** | | | | | | | | | | | |

| Assess and rate each of the following (CIWA-Ar Scale): | Refer to reverse for detailed instructions in use of the CIWA-Ar scale. | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nausea/vomiting** (0 - 7)<br>0 - none; 1 - mild nausea ,no vomiting; 4 - intermittent nausea;<br>7 - constant nausea , frequent dry heaves & vomiting. | | | | | | | | | | | | |
| **Tremors** (0 - 7)<br>0 - no tremor; 1 - not visible but can be felt; 4 - moderate w/ arms extended; 7 - severe, even w/ arms not extended. | | | | | | | | | | | | |
| **Anxiety** (0 - 7)<br>0 - none, at ease; 1 - mildly anxious; 4 - moderately anxious or guarded; 7 - equivalent to acute panic state | | | | | | | | | | | | |
| **Agitation** (0 - 7)<br>0 - normal activity; 1 - somewhat normal activity; 4 - moderately fidgety/restless; 7 - paces or constantly thrashes about | | | | | | | | | | | | |
| **Paroxysmal Sweats** (0 - 7)<br>0 - no sweats;   1 - barely perceptible sweating, palms moist;<br>4 - beads of sweat obvious on forehead;   7 - drenching sweat | | | | | | | | | | | | |
| **Orientation** (0 - 4)<br>0 - oriented; 1 - uncertain about date; 2 - disoriented to date by no more than 2 days; 3 - disoriented to date by > 2 days;<br>4 - disoriented to place and / or person | | | | | | | | | | | | |
| **Tactile Disturbances** (0 - 7)<br>0 - none; 1 - very mild itch, P&N, ,numbness; 2-mild itch, P&N, burning, numbness; 3 - moderate itch, P&N, burning ,numbness; 4 - moderate hallucinations; 5 - severe hallucinations;<br>6 – extremely severe hallucinations; 7 - continuous hallucinations | | | | | | | | | | | | |
| **Auditory Disturbances** (0 - 7)<br>0 - not present; 1 - very mild harshness/ ability to startle; 2 - mild harshness, ability to startle; 3 - moderate harshness, ability to startle; 4 - moderate hallucinations; 5 severe hallucinations;<br>6 - extremely severe hallucinations; 7 - continuous.hallucinations | | | | | | | | | | | | |
| **Visual Disturbances** (0 - 7)<br>0 - not present;   1 - very mild sensitivity;    2 - mild sensitivity; 3 - moderate sensitivity;    4 - moderate hallucinations;   5 - severe hallucinations;    6 - extremely severe hallucinations;  7 - continuous hallucinations | | | | | | | | | | | | |
| **Headache** (0 - 7)<br>0 - not present; 1 - very mild; 2 - mild; 3 - moderate; 4 - moderately severe; 5 - severe; 6 - very severe; 7 - extremely severe | | | | | | | | | | | | |
| Total  CIWA-Ar score: | | | | | | | | | | | | |
| PRN Med:   (circle one)   **Dose given (mg):**<br>Diazepam      Lorazepam              **Route:** | | | | | | | | | | | | |
| **Time** of PRN medication administration: | | | | | | | | | | | | |
| Assessment of response (CIWA-Ar score 30-60 minutes after medication administered) | | | | | | | | | | | | |
| RN Initials | | | | | | | | | | | | |

| **Scale for Scoring:**<br>Total Score =<br>　　　0 – 9: absent or minimal withdrawal<br>　　　10 – 19: mild to moderate withdrawal<br>　　　more than  20: severe withdrawal | **Indications for PRN medication:**<br>a.  Total CIWA-AR score 8 or higher if ordered PRN only (Symptom-triggered method).<br>b.  Total CIWA-Ar score 15 or higher if on Scheduled medication. (Scheduled + prn method)<br>Consider transfer to ICU for any of the following: Total score above 35, q1h assess. x more than 8hrs required,  more than 4 mg/hr lorazepam x 3hr **or** 20 mg/hr diazepam x 3hr required, or resp. distress. |
|---|---|

Patient Identification (Addressograph)

| Signature/ Title | Initials | Signature / Title | Initials |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Alcohol Withdrawal Assessment Flowsheet** (revised Nov 2003)

2

52.     CIWA-Ar and COWS should be administered at least every four to six hours to a person at risk of withdrawing, and more frequently (such as every hour) if a person is ill or exhibiting more severe symptoms of withdrawal.

53.     Scoring scales such as CIWA-A and COWS are effective for monitoring symptoms that change over time.  If the tool is not utilized in sequential manner, then the worsening of a patient's severity can be missed.  In a correctional setting, COWS and CIWA-A allow the same symptoms to be consistently scored and monitored by multiple personnel over multiple shifts.  Thus, a person's progression, and worsening of withdrawal symptoms, can be evaluated consistently and the treatment regimen can be modified as needed based on the score.

54.     The severity of a COWS or CIWA-Ar score will typically dictate the type of treatment that is administered to the person suffering from withdrawal. When COWS or CIWA-Ar scores are too high transfer to a high level of care (e.g., the emergency department) is immediately required.  Common medications administered to individuals suffering from opioid withdrawal include buprenorphine, ondansetron, dicyclomine, loperamide, and ibuprofen. Buprenorphine is the primary medication to treat opioid use disorder and associated acute pain.  This medication works as a substitute for opioids without causing euphoria and dangerous side effects and allows for a gradual weaning process that makes the withdrawal symptoms less intense and fatal.

55.     Because of the seriousness of alcohol and opioid withdrawal, the COWS and CIWA-Ar assessment process must be managed and overseen by a physician who can immediately respond to worsening symptoms, tailor the medication and treatment regime, and initiate transfer to a high level of care when the jail's medical facility is not able to address the patient's needs.

56.     Here, due to Ms. Lines' obvious risk of alcohol and opiate withdrawal, intake nurse, Marybel Labastill performed a COWS and CIWA screening evaluation at intake. Based on Marybel Labastill's screening evaluation, Ms. Lines'

2

COMPLAINT

CIWA score was 0, with a *directive to re-screen Ms. Lines in 8 hours*. Ms. Lines' COWS score was 5, with a *directive to re-screen Ms. Lines in 8 hours.*

57.    At that point in the intake process, Ms. Lines' vitals were taken. Her blood pressure was elevated, with a reading of 135/74. Marybel Labastill ended her intake evaluation by placing Ms. Lines on the COWS and CIWA protocol and ordering reassessment in 8 hours.

58.    At approximately 2:45 pm, Ms. Lines underwent a urine drug screen test.  Ms. Lines tested positive for methamphetamine, marijuana, MDMA (Ecstasy), amphetamine, and fentanyl.  Each Defendant was aware of these results are they were included in Ms. Lines electronic medical chart and intake records.

59.    Less than two hours later, at 4:19 pm, Defendant Nhi Ngoc Dai (PA) was tasked with assessing Ms. Lines for alcohol and opiate withdrawals and prescribing medication. Based on Ms. Lines' medical chart, PA Dai knew that Callen Lines abused stimulants and had tested positive for methamphetamine and fentanyl. Defendant Nhi Ngoc Dai, however, failed to perform a COWS or CIWA assessment specifically evaluating and screening for signs and symptoms associated with withdrawals. PA Dai conducted no evaluation or assessment regarding stimulant intoxication and/or withdrawal, and did not ask Callen Lines any questions regarding this. While acknowledging Ms. Lines' addiction issues and need for withdrawal management, Defendant Nhi Ngoc Dai delayed the administration of buprenorphine, which is the most significant and effective drug used to manage opioid withdrawals. At no time during this assessment, did Defendant Nhi Ngoc Dai evaluate/screen Ms. Lines or document any intoxication and/or withdrawal symptoms.

60.    Moreover, Nhi Ngoc Dai also failed to take Ms. Lines' vitals during this assessment. The records indicate Defendant Nhi Ngoc Dai relied on the initial vitals taken during the intake process. However, Defendant Nhi Ngoc Dai failed to reconcile Ms. Lines' initial elevated vitals with her current symptoms of withdrawal

3

COMPLAINT

and also failed to reconcile those findings with her order to delay administration of buprenorphine.

61.    Symptoms indicative of stimulant intoxication include tachycardia, hypertension, hyperthermia, and agitation. PA Dai asked no questions regarding Ms. Lines' possible stimulant intoxication.

62.    PA Dai ordered the following medications for Ms. Lines' pending alcohol withdrawals: ondansetron, levetiracetam, loperamide, acetaminophen, thiamine. These medications are considered "comfort medications." Gastrointestinal upset is the most severe opiate withdrawal symptom.  For these symptoms, ondansetron is prescribed to treat nausea and vomiting. Levetiracetam is prescribed to treat seizures. Loperamide is prescribed to treat diarrhea. Defendant Nhi Ngoc Dai also prescribed diazepam, on a tapered schedule starting with three administrations on the first day. Diazepam is a medication used to prevent the symptoms and complications of moderate to severe alcohol withdrawal.

63.    Regarding medication for opiate withdrawal, Defendant Nhi Ngoc Dai prescribed docusate sodium used to treat constipation and buprenorphine. Buprenorphine is the most common medication used to treat opiate withdrawal and prevent fatalities.

64.    Although Defendant Nhi Ngoc Dai ordered medications for Ms. Lines, Defendant made no attempt to have a nurse administer them to Ms. Lines immediately.

65.    Notably, Defendant Nhi Ngoc Dai treated Ms. Lines the month prior. During that incarceration, Defendant Nhi Ngoc Dai assessed and treated Ms. Lines for withdrawals. Defendant Nhi Ngoc Dai knew that Ms. Lines was transported to the Emergency Room the following day due to severe withdrawal symptoms including seizures.

66.    Later that evening at 6:51 pm, Defendant Jarell Sanchez (LVN) was assigned to administer medication. Pursuant to the medication order, Defendant

4

COMPLAINT

Jarell Sanchez was supposed to administer all the medications prescribed by Defendant Nhi Ngoc Dai. However, Defendant Jarell Sanchez intentionally decided to only administer acetaminophen and levetiracetam. Buprenorphine was not administered. During this medication administration, Defendant Jarell Sanchez took Ms. Lines' vitals. This time her blood pressure was 160/90. This reading is significantly elevated and is associated with a high risk of heart attack, stroke, or seizure. Aside from documenting the vitals, Defendant Jarell Sanchez failed to provide additional care, failed to take Ms. Lines to the medical clinic for additional evaluation, and failed to notify the charge nurse that Ms. Lines' vitals were dangerously elevated.

67. Moreover, despite the order to reassess Ms. Lines pursuant to the COWS and CIWA protocols, and despite Ms. Lines' objective withdrawal symptoms, coupled with her dangerously elevated blood pressure, Defendant Jarell Sanchez failed to provide care and failed to notify the charge nurse to elevate care.

68. Approximately 15 minutes later, a second intake exam was performed by Defendant Jillaine Smasal-Kwak (NP) through the medical window in the intake area. Defendant Jillaine Smasal-Kwak knew Ms. Lines was on the COWS and CIWA withdrawal protocol, tested positive for fentanyl, amphetamines, and methamphetamine, and that she was required to assess Ms. Lines following her initial booking screening, per the intake nurse's follow-up orders. Defendant Jillaine Smasal-Kwak knew Ms. Lines had a history of severe withdrawals. She also knew that Ms. Lines' blood pressure was dangerously elevated based on the reading from 15 minutes prior. During the evaluation Ms. Lines told Defendant Jillaine Smasal-Kwak that she was "really cold," which is another symptom associated with intoxication and withdrawal. Despite Ms. Lines suffering from obvious symptoms indicative of intoxication and withdrawal, dangerously elevated blood pressure, and with a recent history of withdrawal-related seizures, Defendant Jillaine Smasal-Kwak failed to: 1) screen Ms. Lines pursuant to the COWS and

5

COMPLAINT

CIWA protocols; 2) administer buprenorphine or any other medication; 3) evaluate Ms. Lines for stimulant intoxication and/or withdrawal; 4) formulate any plan for treating Ms. Lines' risk of stimulant intoxication and/or withdrawal; and 4) initiate follow-on care or monitoring for that night. Defendant Jillaine Smasal-Kwak simply instructed Ms. Lines to contact staff with any medical concern.

69.     Defendants Dai, Sanchez, and Smasal-Kwak were well-aware that Ms. Lines was at risk of severe alcohol and opioid withdrawal as well as drug intoxication.  However, none of the medical providers screened Mr. Lines pursuant to the County's withdrawal protocols, nor did they ask Ms. Lines about her worsening symptoms. For instance, although Defendants Dai, Sanchez, and Smasal-Kwak knew Ms. Lines was supposed to be on a COWS and CIWA monitoring protocols, there is no indication they inquired about Ms. Lines's COWS or CIWA scores.  They did not document the absence of any initial or subsequent COWS or CIWA scores. Although Ms. Lines's medical records indicated she should be reassessed and scored on the COWS and CIWA scale every four-eight hours, there was no COWS or CIWA score or assessment for Ms. Lines following her initial intake at 2:00 pm.

70.     Defendants Sanchez and Smasal-Kwak also knew that Ms. Lines was supposed to be receiving the medication ordered by Defendant Dai.  Even though Ms. Lines's medical records reflected that she had not received buprenorphine or diazepam on May 11, 2025. Defendants Sanchez and Smasal-Kwak made no effort to ensure Ms. Lines received this medication and made no effort to document the failure of nursing staff to deliver medication to Ms. Lines.

71.     At this point, during the evening of May 11th, Ms. Lines had been in County custody since 2:00 pm. Since her initial intake, Ms. Lines was never screened or evaluated pursuant to the County's COWS and CIWA withdrawal protocols, nor was Ms. Lines administered live-saving withdrawal medications that day or night. Although medical personnel were all aware that Ms. Lines had tested

6

COMPLAINT

positive for stimulants, and Ms. Lines was a known regular user of methamphetamine, no one noted or addressed her risk of stimulant intoxication and/or withdrawal. These failures put Ms. Lines in acute danger of serious harm or death.

72. The following day, May 12, 2025, Ms. Lines received the only COWS and CIWA screening evaluation since intake. Ms. Lines was screened by Grace Leonor (RN) at 10:35 am. The assessment started with taking Ms. Lines' vitals. Her blood pressure reading was 159/100. Ms. Lines' blood pressure was, again, dangerously elevated, putting her at significant risk of stroke, heart failure, and seizures, in combination with her other withdrawal symptoms.

73. With regard to the CIWA screening evaluation, Ms. Lines displayed the following symptoms: nausea, decreased intake, visible tremors, anxiety, and headaches. Grace Leonor determined that Ms. Lines' CIWA score was a 9, with a directive to reassess in 6 hours. According to medical literature, a CIWA score of 9 indicates mild to moderate withdrawal. The patient should be closely monitored with screening evaluations to occur frequently until the patient is no longer suffering from withdrawal symptoms or requires a higher level of care.

74. As for the COWS screening evaluation, which was also performed by Grace Leonor, Ms. Lines displayed the following symptoms: elevated pulse rate, bone or joint aches, nausea, diarrhea, visible tremors, and anxiety. Grace Leonor determined that Ms. Lines' COWS score was an 8, with a directive to reassess in 8 hours. Similar to the CIWA scoring, a COWS score of 8 indicates mild opioid withdrawal. The patient should be closely monitored with screening evaluations to occur every 4 to 8 hours until the patient is no longer suffering from withdrawal symptoms, or requires a higher level of care.

75. Importantly, Grace Leonor acknowledged that Ms. Lines had not received buprenorphine, or many of the other medications prescribed for withdrawal, and ordered buprenorphine to be administered to taper/reduce Ms.

7

COMPLAINT

Lines' withdrawal symptoms.

76.    Despite Grace Lenor's order for additional CIWA re-screening in 6 hours, (and COWS re-screening in 8 hours), Ms. Lines was never again assessed by a medical provider or screened for withdrawal symptoms prior to her death. The failure to continually monitor Ms. Lines is a result of a custom and practice maintained by jail officials, as detailed below.

77.    Based on information and belief, at some point in the morning, after the assessment by Grace Leonor on May 12, 2025, Ms. Lines was finally transferred from the intake area to the detox housing dorm, 3H. At Las Colinas, module 3H is the detox dorm where medical providers are supposed to monitor the inmates at least 3 times per day, assessing the inmates for withdrawal symptoms. The deputies assigned to 3H are required to perform cell checks every 30 minutes (as opposed to hourly checks) to ensure the inmates are not in medical distress. According to percipient-inmate-witnesses, neither the medical staff nor the correctional staff perform timely checks in 3H. In fact, according to two witnesses that were housed in 3H on May 12, 2025, the medical staff only performed one dorm check in the morning, and the deputies only performed hourly safety checks.

78.    According to the medical documents provided by the County to the Lines family, there is a "Medication Refusal" form indicating that Ms. Lines refused to take the prescribed buprenorphine offered to her—*for the first and only time*—by Defendant Owen Gambiza at 11:27 am on May 12, 2025. In other words, according to the Medication Refusal form, following Grace Leonor's screening assessment, Defendant Owen Gambiza attempted to administer buprenorphine to Ms. Lines at 11:27 am on May 12, 2025, which Ms. Lines allegedly refused to take the medication.

79.    It was uncharacteristic of Ms. Lines to purportedly refuse only the buprenorphine. The medical records indicate that Ms. Lines took other medications offered at the same time the buprenorphine was allegedly offered. Given Callen's

8

COMPLAINT

awareness of her risk of fentanyl withdrawal, it makes no sense that Ms. Lines declined only the buprenorphine. Additionally, previous medical records from the jail show that Ms. Lines never refused buprenorphine in prior incarcerations and she reported suffering from fentanyl withdrawal. Finally, the refusal form does not have Ms. Lines' signature.

80. Buprenorphine is also a Schedule III controlled substance that is typically administered in a monitored clinical setting. According to the reports of percipient witnesses in housing unit 3H, Callen Lines never left her cell once she was placed in 3H as the unit was on lockdown, meaning Ms. Lines never went to the clinic for medication. For these reasons, based on information and belief, Plaintiffs allege that Defendant Owen Gambiza never gave Ms. Lines buprenorphine.

81. Even if Defendant Gambiza did offer Ms. Lines buprenorphine and she declined to take it, Defendant Gambiza still acted with reckless disregard for Callen's serious medical needs. Defendant Owen Gambiza knew that Ms. Lines was suffering from moderate withdrawals and had not been provided buprenorphine, despite PA Dai's order. Per County policy, when an inmate refuses medication, the nurse is required to counsel and instruct Ms. Lines about the importance of taking the buprenorphine. Defendant Gambiza was also required to notify a higher-level provider of Ms. Lines' alleged refusal because Defendant Owen Gambiza knew that Ms. Lines' COWS and CIWA scores were trending upwards, her vitals were dangerously elevated and fluctuating, and Ms. Lines, according to other inmates housed in 3H, was outwardly suffering from serious withdrawal symptoms. Despite these alarming red flags regarding the state of Ms. Lines's health, and the lack of treatment she had received for withdrawal up to that point, Defendant Gambiza took no action. He did not refer Ms. Lines to a higher level of care.  He did not alert any doctor or a supervisory nurse.  He did not inquire as to whether Ms. Lines should be transferred to a hospital. Instead, Defendant

9

COMPLAINT

Owen Gambiza did nothing, leaving Ms. Lines to suffer without ever taking a single dose of buprenorphine.

82. According to witnesses housed in Module 3H, Ms. Lines was transferred to Module 3H at approximately 11:00 a.m. While Ms. Lines was housed in 3H, she was never again screened for COWS or CIWA symptoms.

83. According to an inmate housed in 3H, Inmate #1, Ms. Lines was placed in cell 14 (on the bottom tier). Inmate #1 was housed on the top tier in a cell directly across from Ms. Lines' cell. Inmate #1 stated she had a direct view of Ms. Lines' cell. According to Inmate #1, since Ms. Lines was placed in cell 14, she yelled and screamed for "help," nearly the entire time she was housed in 3H. Inmate #1 heard Ms. Lines tell DOE Deputy #1 and DOE Deputy #2 that she wasn't feeling good and needed medical attention. Inmate #1 stated that she overheard Ms. Lines tell the DOE deputies that she was experiencing severe symptoms of withdrawals and was even listing out her symptoms. At one point, Ms. Lines was yelling that she couldn't breathe. In response, DOE Deputy #1 said, "you're lying" and "sit down." According to Inmate #1, neither DOE Deputy #1 (the male deputy) or DOE Deputy #2 (the female deputy) checked on Ms. Lines to determine if she was in medical distress.

84. Another inmate witness ("Inmate #2") came forward and stated that she was housed in the same cell as Ms. Lines on the evening of her death. Specifically, Inmate #2 stated she was first housed in 3H on April 30, 2025, and did not have another cell mate on May 11, 2025. On the morning of May 12, 2025, Inmate #2 was taken to court at approximately 4:00 am. When Inmate #2 returned from court at approximately 4:00 pm, the inmate returned to Ms. Lines as her cell mate. According to Inmate #2, once she arrived back to cell 14, Ms. Lines immediately asked her if she had any fentanyl because she was suffering from "bad withdrawals." Inmate #2 stated she had no drugs and that the unit was on lockdown. According to Inmate #2, Ms. Lines was screaming at DOE Deputies #1 and #2 that

10

COMPLAINT

she wasn't feeling well and needed medical assistance. At times, Ms. Lines kicked and banged on the door to gain the deputies' attention. DOE Deputies #1 and #2 continued to ignore Ms. Lines.

85. According to Inmate #2, Ms. Lines was shaking, sweating, anxious, agitated, and restless—all significant intoxication and withdrawal symptoms, when combined with Ms. Lines' nausea and elevated vitals.

86. Furthermore, according to Inmate #2, she observed Ms. Lines activate the intercom button, located inside the cell, on at least four occasions.

    a. The first time Ms. Lines pushed the intercom button she told DOE Deputy #2 (the female deputy) that she was having a seizure and needed medical attention. DOE Deputy #2 responded, "How are you talking to me if you're having a seizure?" DOE Deputy #2 terminated the call and never came to check whether Ms. Lines was in medical distress.

    b. The second time Ms. Lines pushed the intercom button she told DOE Deputy #1 (the male deputy) that she had been bailed out and should be released. DOE Deputy #1 called Ms. Lines a "liar" and terminated call.

    c. The third time Ms. Lines pushed the intercom button she told DOE Deputy #1 that she threw up on herself and needed to take a shower. Deputy #1 responded, "you can't shower now, maybe later." Following this call, DOE Deputy #1 never checked whether Ms. Lines was in medical distress.

    d. Finally, the fourth time Ms. Lines pushed the intercom button she told DOE Deputy #1, "I feel like I'm going to pass out, I'm going out." DOE Deputy #1 responded, "sit down." Following this call, DOE Deputy #1 never checked whether Ms. Lines was in medical distress.

11

COMPLAINT

87.     In response to DOE Deputy #1's statement, Ms. Lines sat directly in front of the cell door window. According to Inmate #2, Ms. Lines remained sitting on the chair in the same position. Inmate #2 stated she fell asleep soon after the last intercom call because she got up early that day for court.

88.     According to Inmate #2, during a later hourly safety cell check, she briefly woke up to use the restroom. During that time, she observed DOE Deputy #1 pass by the cell without stopping and heard Ms. Lines (who was sitting on the chair directly in front of the cell door window) yell at DOE Deputy #1, "wait, wait, excuse me, please wait." DOE Deputy #1 ignored Ms. Lines and continued walking away.

89.     At approximately 7:25 pm., Inmate #2 woke up to DOE Deputy #1 knocking loudly on the cell door. Inmate #2 observed DOE Deputy #1 gesturing with his hands, as if to indicate, "what's up?" while pointing towards Ms. Lines.

90.     Inmate #2 noticed Ms. Lines was lying on the chair with her back on the seat of the chair and her left arm hanging off the chair, sticking outwards. Inmate #2 observed Ms. Lines was "completely blue and purple." Inmate #2 looked at DOE Deputy #1 and stated, "she's dead." DOE Deputy #1 responded, "Oh shit."

91.     DOE Deputy #1 entered the cell to pick up Ms. Lines' body and place it on the floor of the cell. He then began CPR and administering NARCAN. Within minutes, the medical staff responded and took over resuscitative efforts.

92.     Ms. Lines was transported by paramedics to the hospital, where Ms. Lines was pronounced dead.

**B.     The County of San Diego was Aware of Lethal Deficiencies in the Sheriff's Department's Protocols for Treatment of Substance Withdrawal in Jails.**

      *1.     The National Commission on Correctional Healthcare warns the Sheriff's Department that it must implement COWS and CIWA*

93.     In 2017, the Sheriff's Department invited the National Commission on Correctional Healthcare to tour the San Diego County jail facilities and evaluate the delivery of medical care within the jails.  Because the Sheriff's Department sought accreditation by the NCCHC, the Department requested the NCCHC's review team to assess the County jails and provide recommendations for improvement. Although the Sheriff's Department's jails have not yet achieved NCCHC accreditation, according to public statements by Defendant Kelly Martinez, it remains a goal of the Department.

94.     The NCCHC issued a report in January 2017 noting the failure of the Sheriff's Department to meet the NCCHC standards required for accreditation. Relevant to this case, the NCCHC noted that the Sheriff's Department's standardized nursing protocols (SNPS) for alcohol withdrawal had not been reviewed since July 10, 2008.  The SNP was based on references to four articles.

95.     The NCCHC concluded the Sheriff's Department failed to meet all compliance indicators for the NCCHC's standards for intoxication and withdrawal policies.  It stated the Sheriff's Department failed because its protocols for treatment of drug and alcohol withdrawal were not consistent with national standards. *See* NCCHC Technical Assistance Report, pp. 95-96.

96.     In the matter of *Estate of Elisa Serna et. al. v. County of San Diego et al.*, Southern District of California case no. 20-cv-2096-BAS-DDL, the *Serna* plaintiffs deposed Defendant Dr. Montgomery, the Sheriff's Department's Chief Medical Officer.  Dr. Montgomery testified at this deposition that he agreed with the NCCHC's statement that clinical management of withdrawal should include the use of validated withdrawal assessment instruments such as COWS and CIWA-A.

97.     The NCCHC's standard for intoxication and withdrawal, including a description of its requirements for compliance, states in relevant part:

> Detoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience.  As a

13

COMPLAINT

precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times. **Clinical management should also include the use of validated withdrawal assessment instruments, such as the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale in cases of opiate withdrawal, and the Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised, in the case of alcohol withdrawal**. NCCHC 2014 Guidelines for Intoxication and Withdrawal p. 125 (emphasis added).

2.   *The death of Elisa Serna from untreated alcohol and drug withdrawal occurring on November 11, 2019*

98.    Most significantly, the death of Elisa Serna on November 11, 2019, placed the Sheriff's Department on notice regarding woeful inadequacies in the care and treatment of individuals suffering from substance withdrawal. After Ms. Serna's death, Defendant Jon Montgomery, the Chief Medical Officer of the Sheriff's Department, conducted a review of Ms. Serna's death. Dr. Montgomery concluded that Ms. Serna was withdrawing from alcohol, opioids, and benzodiazepine while she was detained and before her death. Although Ms. Serna was withdrawing from alcohol, opioids, and benzodiazepine, no withdrawal protocol was implemented.

99.    Dr. Montgomery noted in his review of Ms. Serna's death that the clinical policies were "ineffective." Although Ms. Serna had been "recognized as a candidate for a withdrawal protocol" Dr. Montgomery wrote that "[m]edications/withdrawal protocol [were] not implemented." Dr. Montgomery observed "poor documentation" made the case "hard to fully evaluate . . . Room for improvement." Dr. Montgomery stated that the medical response to Ms. Serna could have been improved. In terms of improving care, Dr. Montgomery observed that nursing staff should be trained in "cultural awareness regarding compassion and 'taking things for granted.'" Dr. Montgomery explained that "taking things for

14

COMPLAINT

granted" referenced the notes that Ms. Serna was faking symptoms or malingering. Medical providers had allowed themselves to be "influenced by commentary, rumor, what have you, rather than responding to the facts at hand and the patient presenting in front of [them]."

100.    At the time of Ms. Serna's death in November 2019, the San Diego County Sheriff's Department's protocol for treatment of alcohol withdrawal did not require the use of the Clinical Institute Withdrawal Assessment for Alcohol ("CIWA-A") or Clinical Institute Withdrawal Assessment for Alcohol-Revised ("CIWA-AR").  The Sheriff's Department's protocol for treatment of heroin/opioid withdrawal did not require the use of the Clinical Opiate Withdrawal Scale ("COWS").

101.    In the *Estate of Elisa Serna* matter, Dr. Homer Venters, the Serna Plaintiffs' correctional medicine expert, opined the "San Diego County Sheriff's Department's failure to implement a system of regular monitoring of withdrawal severity, using COWS and CIWA or similar scoring tools, and its failure to implement a system of care based on the severity of withdrawal, were serious and deadly deficiencies that led to Ms. Serna's ultimate demise."  Dr. Venters noted that because COWS and CIWA were not required to be used, nursing staff failed to regularly monitor Ms. Serna for the signs and symptoms of alcohol, opioid, and benzodiazepine withdrawal.  "Although some of the elements that are part of those assessment tools were measured, they were not repeated in a consistent manner or in a consistent frequency, and some important elements were missed all together. This resulted in a collective failure to appreciate the severity of Ms. Serna's withdrawal and the worsening of her symptoms."  Worse still, rather than objectively measure the progression of her withdrawal using COWS and CIWA, the health staff dismissed Ms. Serna as faking or exaggerating her symptoms of withdrawal, such as faking fainting spells and self-inducing vomiting.

102.    In the *Serna* matter, Dr. Sucher, the Serna Plaintiffs' addiction

15

COMPLAINT

medicine specialist, opined that these scoring scales are the "standard of care, [the] best objective measures of severity of withdrawal and need for medication and/or higher levels of care for treatment."

103.   After the County of San Diego and other defendants reached a global settlement of $15 million in the *Serna* matter, Defendant Kelly Martinez issued a press release[1] that stated as follows:

> Elisa Serna died in Sheriff's custody on November 11, 2019.  Elisa Serna deserved better.  My sympathy goes to the Serna family and everyone who has been affected by this case, and I am glad that the County of San Diego and the family have reached a settlement.
>
> At the time of this incident, I was the Assistant Sheriff of Law Enforcement Services overseeing, among other areas, the Sheriff's Homicide Unit.  It was brought to my attention that the detective assigned to investigate Elisa's death believed some of our own staff and contracted medical providers could be criminally liable in the case.  I am grateful for the investigator's courage in bringing that information forward.  We submitted the investigation to the District Attorney's Office for review and prosecution and the case ultimately went to trial earlier this year. I am grateful to the District Attorney, the court, and the jury for their careful consideration during the criminal trial.
>
> When I was elected as Sheriff in November 2022, I attempted to meet with the Serna family, and they, perhaps understandably, did not respond to my efforts.  I am glad that part of this settlement will provide me the opportunity to meet with them and I hope that meeting brings them further closure. . . .
>
> There have been many changes and an incredible shift in priorities, approach, and processes in our jails since 2019.  As Sheriff I am committed to improving our jail system and ensuring the jails are safe for everyone who is incarcerated and for all our employees. I will continue to provide my staff with the training, tools, and equipment they need to do their jobs at the highest level.
>
> Sheriff Kelly A. Martinez

> 3. *The death of Vianna Granillo from untreated alcohol and drug withdrawal occurring on July 13, 2022*

[1] The press release is available at:
https://www.sdsheriff.gov/Home/Components/News/News/2818/16

16

COMPLAINT

104.    In addition to the death of Elisa Serna on November 11, 2019, the strikingly similar death of Vianna Granillo also placed the Sheriff's Department on notice regarding woeful inadequacies in the care and treatment of individuals suffering from substance withdrawal.

105.    Similar to Ms. Lines and Elisa Serna, Vianna Granillo advised medial staff that she was a daily opioid and alcohol user. Vianna Granillo had a history of prior withdrawal treatment while in custody and told staff she would likely suffer from severe withdrawals. Similar to Ms. Lines and Elisa Serna, Vianna Granillo was not screened pursuant to the COWS and CIWA protocols and was only administered one dose of lifesaving withdrawal medication.  Despite her efforts and requests for medical assistance, Vianna Granillo was ignored by staff until her eventual death five days after her arrest.

### 4. *Deaths of other inmates at San Diego County jails from untreated drug and alcohol withdrawal*

106.    Long before Ms. Lines' death, the County of San Diego was well-aware of deficiencies in the treatment of inmates suffering from life-threatening withdrawal from drugs and alcohol.

107.    **Death of Richard Boulanger on February 12, 2016**.  On February 8, 2016, Richard Boulanger was arrested and booked into a San Diego County jail. During medical screening/intake, he reported that he regularly abused opioids and alcohol.  There was a delay, however, in administering treatment for his withdrawal.  On February 12, 2016, Boulanger committed suicide.  The United States Department of Justice's publication, *Guidelines for Managing Substance Withdrawal in Jails*, notes that risk for suicidal ideation and suicide attempts is increased among individuals suffering from substance withdrawal and for those with a substance use disorder.  Significantly, individuals with opioid use disorder "have a threefold higher risk for suicidal behavior than those without OUD (opioid

17

COMPLAINT

use disorder)." On April 9, 2019, the U.S. Food and Drug Administration issued a bulletin warning medical providers that sudden cessation of opioids by patients can lead to suicide. Accordingly, Richard Boulanger's death was a direct and proximate result of the County's failure to implement adequate withdrawal protocols and training.

108. **Death of Wellington Kemplin on August 15, 2017**. On August 15, 2017, Wellington Kemplin was booked into the San Diego Central Jail and died later that day. The Medical Examiner's report regarding Mr. Kemplin's death notes that San Diego Sheriff's Medical Department medical records showed Mr. Kemplin was "a chronic alcoholic." Records from UCSD Medical Center showed Kemplin had numerous medical issues, including a history of alcohol abuse, seizures, and seizures during withdrawal. The Medical Examiner determined the cause of Mr. Kemplin's death was "seizure disorder" with "chronic alcoholism" and "remote blunt force head trauma" among the contributing factors of his death.

109. **Death of Bruce Stucki on March 18, 2017**. On March 16, 2017, Mr. Stucki was found arrested for public intoxication and booked into the Vista Detention Facility. A review of Mr. Stucki's death by the Citizens Law Enforcement Review Board (CLERB) made the following observations. "During Mr. Stucki's medical screening it was determined that he was a chronic consumer of vodka and would 'shake' when he stopped consuming it." For "unknown reasons" Mr. Stucki was not placed on an alcohol withdrawal protocol. Two days later, on March 18, 2017, Mr. Stuck was found hallucinating and withdrawing from alcohol. At that point, Stucki was placed on an alcohol withdrawal protocol. A few hours after the alcohol withdrawal protocol was initiated, Mr. Stucki was found "unresponsive" in his cell. He died at the jail. "The cause of death was complications of chronic alcoholism." CLERB submitted a letter to Sheriff Gore dated August 16, 2018, regarding Mr. Stucki's death. That letter stated CLERB expressed concern about "the following possible medical personnel misconduct

discovered during the course of CLERB's investigation" including "[m]edical personnel's failure to initiate an alcohol withdrawal protocol for two days." Leadership within the Medical Services Division at the Sheriff's Department never investigated the concerns identified by CLERB. Accordingly, Bruce Stucki death was a direct and proximate result of the County's failure to implement adequate withdrawal protocols and training.

110. **Death of Jeremy Thomas on May 29, 2019**. Jeremy Thomas, a 28-year-old former Marine died May 29, 2019, after he had been booked on drug charges. Mr. Thomas lost his hand in Afghanistan in 2011 and was featured in a Union-Tribune story two years ago about veterans being over-prescribed opioids for pain. Mr. Thomas told medical staff that he was going through withdrawal. Rather than treating him for withdrawals and monitoring him, he was sent to his cell without treatment. Shortly after, he was pronounced dead. Accordingly, Jeremy Thomas' death was a direct and proximate result of the County's failure to implement adequate withdrawal protocols and training.

111. **Death of Hayden Shuck on March 16, 2022**. On March 16, 2022, Hayden Schuck died from drug withdrawals. Despite advising medical staff that he used drugs daily, he was not provided withdrawal medications and was not medically monitored during the first week of his detainment. During his detainment Mr. Schuck displayed signs and symptoms of withdrawal which were known to medical staff but were ignored and untreated. Accordingly, Hayden Shuck's death was a direct and proximate result of the County's failure to implement adequate withdrawal protocols and training.

5. *Inmates suffering from substance use disorders and withdrawal are a frequent and reoccurring occurrence at San Diego County jails*

112. "At the time of arrest and detention, it has been estimated that 70 to 80 percent of all inmates in local jails and State and Federal prisons had regular drug

19

COMPLAINT

use or had committed a drug offense, and 34 to 52 percent of these inmates were intoxicated at the time of their arresting offense." Center for Substance Abuse Treatment, 2006, Detoxification and Substance Abuse Treatment, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved November 1, 2023 from https://store.samhsa.gov/sites/default/files/d7/priv/sma15- 4131.pdf (hereinafter "TIP 45"), at p. 118.

113. "Drug or alcohol intoxication has accounted for an increasing share of deaths in local jails over time. It accounted for 15% of all deaths in 2019, after suicide and heart disease (25%). The rate of intoxication deaths more than quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019." E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," Bureau of Justice Statistics Statistical Tables, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf at p. 3. For the period of 2000 to 2019, women detained at local jails "died of drug or alcohol intoxication at an average annual rate (20 per 100,000) that was **nearly double** that of male inmates (11 per 100,000)." *Id*. p. 4.

114. In deposition testimony in the *Estate of Elisa Serna* matter, Dr. Montgomery estimated that 70 percent of inmates in the County jails have some form of addiction or substance use issue. That number has been slowly increasing over time. In 2019, Dr. Montgomery testified that more than 50 percent of inmates had substance use issues.

115. In 2021, drug use among individuals in custody in San Diego County jails was at a 22-year high. A staggering 83% of adult arrestees tested positive for at least one controlled substance in 2021.

COMPLAINT

**C.    Purported Improvements in Treatment of Inmates Suffering from Substance Withdrawal After the Death of Elisa Serna**

116.    In his deposition in the Serna matter, Defendant Dr. Montgomery testified that the use of scoring scales such as COWS and CIWA-Ar were implemented at San Diego County jails after the death of Elisa Serna.

117.    On June 1, 2022, the Sheriff's Department issued a press release entitled, *New Intake Screening Process*, that described changes made to medical screening protocols at the jails.[2]  The press release stated that as part of the new medical screening process at jails:

> [A] urine test may be required from the individual prior to booking. We are looking to better identify those experiencing, displaying or reporting signs or symptoms of substance abuse or withdrawal or those with a history of use. **This information will allow providers to start individuals on buprenorphine and other applicable medications to help improve care and safely manage withdrawal**. This is a crucial step in expanding our Medication-Assisted Treatment (MAT) Program.
>
> Those showing withdrawal symptoms will be assessed by a medical provider and **monitored closely**. The screening will help doctors determine the correct dose of medication which includes buprenorphine to help alleviate the patient's withdrawal symptoms.

118.    In this case, Ms. Lines did provide a urine sample.  The results of her urine test showed the presence of methamphetamine, marijuana, ecstasy, amphetamine, and fentanyl.  Despite the results of her urine test, and contrary to the representations of the Sheriff's Department made in its press release, no medical provider started Ms. Lines on buprenorphine or any other medication.  No medical provider assessed Ms. Lines, monitored her closely, or used this information to determine the correct dose of medication for Ms. Lines. Same is true with Ms.

---

[2] This June 1, 2022 press release is available at: https://www.sdsheriff.gov/Home/Components/News/News/1275/514?arch=1&npage=15.  The press release displayed Defendant Captain Kyle Bibel as the media contact.

21

COMPLAINT

Lines. While she was identified at intake as a opioid and alcohol addict, and placed on the withdrawal protocols, she was not 1) screened timely, 2) monitored closely, nor 3) provided with lifesaving medications.

119.   The June 1, 2022, press release by the Sheriff's Department was accompanied by a video that prominently featured Defendant Kelly Martinez and was solely narrated by her.  In the promotional video[3], then Undersheriff Kelly Martinez (now the Sheriff), discussed improvements made to the medical screening process at San Diego County jails.  She stated as follows:

> The most notable change is that all individuals entering a jail will be screened for any history of substance use.  Those showing withdrawal symptoms will be assessed by a medical provider.  The individual will be closely monitored while being treated for medically managed withdrawal.  This is our first step in expanding the medication assisted treatment program.  People who fit this criteria will be asked to provide a urine sample and they will then be referred for further evaluation.  This screening will help medical providers determine the correct dose of medication to alleviate withdrawal symptoms.

120.   On January 5, 2023, after Kelly Martinez was elected Sheriff and assumed that office, the Sheriff's Department issued a press release[4] entitled *County Jail Improvements* that detailed new partnerships and initiatives.  The press release described how, in 2022 as Undersheriff, Martinez made much needed improvements to county jails.  According to the release, throughout 2022, the following changes were made:

> To further streamline and organize the Sheriff's jail healthcare, a five-year initial term contract with Naphcare was initiated. This contract consolidated the contracts into one, with Naphcare providing medical and mental health service within our facilities. The contract provides additional staff and services on an as-needed basis and ensures individuals in our custody are evaluated and treated in a timely manner … Additionally, this partnership has helped standardize policy/practice review and implementation. The Sheriff's Department has started revising policies and procedures with the intent of implementing them

---

[3] This video is available at https://vimeo.com/716182682
[4] The January 5, 2023 press release is available at:
https://www.sdsheriff.gov/Home/Components/News/News/1723/514?npage=2

COMPLAINT

into jail operations in early 2023. With the assistance and guidance of Naphcare, we anticipate beginning the National Commission on Correctional Health Care (NCCHC) accreditation in January 2023 with estimated accreditation taking place in late Fall 2023. . . .

The implementation of a medication-based detoxification program for opioid and alcohol withdrawal was the beginning of a Medication-Assisted Treatment (MAT) Program for in-custody individuals suffering from substance use disorder. . . .

New intake protocols have been introduced requesting urine samples from those arrested who show signs of substance abuse. This process is voluntary. The results help providers to start prescribing these individuals with medications to help improve care and safely manage withdrawal symptoms. . . .

We have also incorporated scoring based on the Clinical Institute Withdrawal Assessment Alcohol Scale (CIWA) and Clinical Opiate Withdrawal Scale (COWS). This scoring allows for better treatment and management of withdrawal symptoms.

121.   Despite these statements by the Sheriff's Department, Ms. Lines's death in May of 2025 from untreated substance withdrawal demonstrates that COWS and CIWA scoring scales, and training thereon, were not meaningfully implemented as Ms. Lines was never continuously monitored for substance withdrawal, nor was she administered medication as prescribed – even though almost six years had passed since Elisa Serna's death and three years since Vianna Granillo's death.

**D.     Factual Allegations Regarding Naphcare and CHP's Liability**

122.   In June 2022, the Sheriff's Department contracted with Defendant Naphcare, Inc. and Naphcare San Diego, LLC for the provision of medical treatment to inmates at San Diego County jails.

123.   In 2024, Naphcare subcontracted CHP, owned and managed by Dr. Freedland, to assist in the provision of medical care inside the jails. CHP reports directly to the Sheriff's Department.

124.   Naphcare, CHP, and Dr. Freedland, were explicitly tasked with overhauling the Medical Service Division's policies and procedures to ensure

23

COMPLAINT

compliance with NCCHC standards. According to Sheriff's Department's press releases, Naphcare was responsible for ensuring the Sheriff's Department achieved NCCHC accreditation. Relevant to this case, Naphcare, CHP, and Dr. Freedland were responsible for ensuring the Sheriff's Department's drug and alcohol intoxication and withdrawal policies and protocols complied with NCCHC standards, meaning COWS and CIWA protocols and scoring scales had to be implemented and training thereon. They were also responsible for staffing licensed medical professionals that would provide treatment as outlined in the Department's drug and alcohol intoxication and withdrawal policies and protocols.

125. Naphcare failed to meet its contractual obligations. In a corrective action notice dated December 1, 2023, the Sheriff's Department informed Naphcare that it was in non-compliance with its contract. It noted Naphcare had not provided NCCHC compliant policies and procedures. Moreover, Naphcare's program manager, DOE #15, did not "consistently serve as the point of contact for general operations, projects and/or resolution of issues." DOE #15 did not provide "timely responses in follow up to operational issues, requests, and guidance. Program Manager shifts issue resolution to Sheriff Nursing staff, relying on their knowledge and experience, rather than learning detentions operations. SDSD staff works directly with Contractor's corporate support in lieu of coordination between Contractor, the SDSD Director of Nursing, and the respective nursing staff. Guidance is lacking and solutions are left to be developed by SDSD staff with minimal Contractor involvement."

126. The Sheriff's Department's corrective action notice further noted that Naphcare had failed to implement a Medication Assisted Treatment (MAT) Program for treatment of substance use disorders as required by the contract. The Sheriff's Department noted that Naphcare had a "Zero Tolerance" policy that the County could not support due to "ADA issues." The notice referenced a problem regarding prescribing medications within the program.

24

COMPLAINT

127.   Ms. Lines's medical records from the jail indicate that the substance withdrawal protocols, such as COWS, were being documented and administered through Naphcare's electronic medical recordkeeping software called "TechCare." The Sheriff's corrective action notice noted specific problems with TechCare: "Contractor (Naphcare) is currently releasing new TechCare builds without providing advanced notice of the changes or training to County Clinical Staff.  In some cases, county staff is faced with screens and cues they [know] nothing about and have no idea how to complete.  This can lead to information being entered into the system that is not followed up creating [potential] liability to the county."

**V.**

**<u>FIRST CAUSE OF ACTION</u>**

**42 U.S.C. Section 1983 – 14th Amendment – Deliberate Indifference to a Serious Medical Need**

**[By Estate of Callen Lines Against Defendant Nhi Ngon Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #1-10]**

128.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

129.   Under the Fourteenth Amendment, Ms. Lines has a guaranteed right to medical care while in the custody and control of the County.

130.   Defendants were charged with the duty to act in accordance with the laws of the state and the Constitution and to provide treatment in accordance with a reasonable standard of care.  Each individual defendant has a particularized duty to summon and/or provide adequate medical care when they are on notice that an inmate is in need of such care.  They are charged to act as a reasonable medical professional, or a correctional deputy, would in the same or similar circumstances.

131.   As detailed above, Ms. Lines was honest and upfront with jail medical staff, informing them she abused opioids and alcohol on a daily basis and was likely to suffer from withdrawal. The intake nurse placed Ms. Lines on the

25

COMPLAINT

withdrawal protocol and performed the first COWS and CIWA screening assessment. Based on the intake nurse's findings, she ordered Ms. Lines to be re-screened in 8 hours. The intake nurse also recorded Ms. Lines' blood pressure at 135/74.

132. It is important to note that when intake nurse, Marybel Labastill, performed her intake assessment, the information provided by Ms. Lines, and Nurse Labastill's assessment, including the COWS and CIWA screenings, were electronically recorded in jail's medical software system, TechCare. TechCare, and other corrections-specific electronic medical records (EMR) systems, record and track healthcare activities and standardize treatment processes. Every medical provider has access to TechCare. It its expected per County policy and pursuant to the standard of care to access and review an inmate's EMR prior to or during any assessment or chart review so that the provider understands the inmate's medical history, current medical risks, abnormal vitals or labs, and prior clinical concerns, including risk of withdrawal. Based on information and belief, every medical provider implicated or directly named herein explicitly reviewed Ms. Lines EMR and was acutely aware of the information set forth therein.

133. At approximately 2:45 pm, Ms. Lines underwent a urine drug screen test. Ms. Lines tested positive for methamphetamine, marijuana, MDMA (Ecstasy), amphetamine, and fentanyl. The results of the urine test were included in Ms. Lines EMR.

134. Defendant Nhi Ngoc Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #5-10 (medical providers), each knew the information set forth in Ms. Lines' EMR because each Defendant accessed and reviewed the EMR. Furthermore, while correctional staff (DOES #1-4), including DOE Deputy #1 and DOE Deputy #2, do not have access to Ms. Lines' complete EMR, they do have access to records that indicate Ms. Lines was on the COWS and CIWA withdrawal protocols and required close monitoring and lifesaving medications. This

26

COMPLAINT

information is especially imputed to DOE Deputy #1 and DOE Deputy #2 because they were the deputies assigned to the detox dorm, 3H.

135. Each Defendant knew that the COWS and CIWA protocol required medical monitoring and scoring throughout the withdrawal process. Furthermore, each Defendant knew that failure to treat opiate withdrawal would likely result in death.

136. Defendant Nhi Ngoc Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #1-10 also knew that Ms. Lines had been treated for opiate withdrawals in her previous detainments, which was reflected in Ms. Lines's correctional and medical profile.

137. However, medical records indicate that Nhi Ngoc Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #5-10 (medical staff) were responsible for assessing, monitoring, treating, and medicating Ms. Lines. Each Defendant failed to properly assess Ms. Lines pursuant to the COWS and CIWA protocols, failed to timely and properly administer the prescribed opiate and alcohol withdrawal medication to Ms. Lines, failed to have her medically monitored throughout the withdrawal process, and failed to communicate or elevate the level of care Ms. Lines' required.

138. PA Dai and NP Smasal-Kwak, both higher level providers, failed to evaluate and assess Callen Lines for risks related to stimulant intoxication and withdrawal. Both Dai and Smasal-Kwak knew that Ms. Lines had tested positive for amphetamines and methamphetamine. Ms. Lines had a history of methamphetamine abuse that was documented in her medical chart. Despite this information, Defendants Dai and Smasal-Kwak took no steps to evaluate Ms. Lines for stimulant intoxication and/or withdrawal, and developed no treatment plan or strategy to monitor Ms. Lines for possible stimulant intoxication and/or withdrawal.

139. Moreover, each Defendant knew that since intake Ms. Lines' blood pressure was dangerously elevated and constantly fluctuating. Defendant Nhi Ngoc

COMPLAINT

Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #5-10 (medical staff) failed to reconcile Ms. Lines' elevated vitals with her current symptoms of withdrawal and also failed to reconcile those findings with the repeated failures to administer the prescribed medications as ordered.

140. Medical records indicate Ms. Lines should have received the above-indicated medications, as prescribed in dose and duration, per Defendant Nhi Ngoc Dai. Ms. Lines was also supposed to be re-screened every 4-8 hours. However, the prescribed medications were not administered and the required COWS and CIWA screenings were not performed by any Defendant or DOES #5-10.

141. In sum, Defendants Dai, Sanchez, Smasal-Kwak, Gambiza and DOES 1-10 were well-aware that Ms. Lines was at risk of severe alcohol and opioid withdrawal, as well as stimulant intoxication and withdrawal, as had occurred in previous incarcerations. However, none of the medical personnel screened Mr. Lines pursuant to the County's withdrawal protocols, nor did they ask Ms. Lines about her worsening symptoms. For instance, although Defendants Dai, Sanchez, Smasal-Kwak, and Gambiza knew Ms. Lines was supposed to be on the COWS and CIWA monitoring protocols, there is no indication they inquired about Ms. Lines's COWS or CIWA scores. They did not document the absence of any initial or subsequent COWS or CIWA scores. Although Ms. Lines's medical records indicated she should be reassessed and scored on the COWS and CIWA scale every four-eight hours, there was no COWS or CIWA score or assessment for Ms. Lines following her initial intake at 2:00 pm, nor did these Defendants ensure she received the prescribed medications as ordered.

142. The medical failures do not end with Defendant Nhi Ngoc Dai, Jarell Sanchez, Jillaine Smasal-Kwak, and Owen Gambiza. DOES #5-10 (medical staff) were also responsible for Ms. Lines' care and treatment. DOES #5-10 were required to assess, screen, and medicate Ms. Lines pursuant to the COWS and CIWA protocol. Those protocols require continual screening and documentation of

28

COMPLAINT

progressing withdrawal symptoms. The scores of the COWS and CIWA screenings, respectively, dictate the medication, dose, treatment, and time interval of the next screening. DOES #5-10 were required to screen and treat Ms. Lines at least three times a day, more if the screening is to occur every 4-6 hours, as was the case on May 12, 2025. DOES #5-10 were deliberately indifferent by failing to screen or medicate Ms. Lines. This includes the May 12, 2025, medical providers that were assigned to re-screen Ms. Lines, per the orders of Grace Leonor, based on the worsening withdrawal symptoms Ms. Lines was displaying on May 12, 2025, at 10:35 am.

143.   Once Ms. Lines was housed in 3H, DOE Deputies #1-4, were responsible for the safety and wellbeing of Ms. Lines. Based on the timeline of events, it is believed Ms. Lines was housed in 3H over the time of two work shifts. Accordingly, there would have been four deputies responsible for Ms. Lines while housed in 3H.

144.   As detailed above, according to inmate witnesses housed in 3H, in the hours leading up to her death, Ms. Lines screamed and begged for help, stating several times that she couldn't breathe and needed medical attention. Ms. Lines at times even banged on the window and cell door to gain the attention of DOE Deputies #1-4. According to Inmate #1, Ms. Lines was begging for help over several hours and was completely ignored by DOE Deputies. According to Inmate #1, Ms. Lines told DOE Deputies she was suffering from withdrawal symptoms and even listed the symptoms she was feeling. Still, DOE Deputies 1-4 stood idly by.

145.   In an effort to save her own life, Ms. Lines activated the intercom button on at least four occasions, stating, at one point, that she was seizing, and at another point that she was vomiting. In response to these intercom calls, DOE deputies called her a "liar" and terminated the calls. Her final intercom call stated she was going to pass out and needed medical help. response to this intercom call, DOE Deputies told her to "sit down," again ignoring her medical distress.

COMPLAINT

146.    According to Ms. Lines' cellmate, Ms. Lines sat down right in front of the cell door window. When the DOE deputy performed the next safety cell check, Ms. Lines begged him to stop and speak with her. The DOE deputy never stopped and continued to ignore Ms. Lines. Hours later, Ms. Lines was discovered dead. According to the cellmate, Ms. Lines was "purple and blue."

147.    In addition to ignoring Ms. Lines' repeated pleas for medical assistance, DOE Deputies also performed improper safety checks. According to the County's policy, when jail staff are conducting checks, they must directly look at each incarcerated person for, among other things, any obvious signs of medical distress or trauma. Adequate safety checks of detainees are required to address precisely this type of risk to detainee safety. Indeed, at the time of Ms. Lines' death, the Due Process Clause of the Fourteenth Amendment required (and continues to require) direct-view safety checks sufficient to determine whether a detainee presents a need for medical treatment. *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). Notably, in a detox dorm such as 3H, DOE Deputies #1-4 were required to conduct safety checks every thirty minutes.

148.    In sum, by failing to administer the proper medication, at the proper times, and by failing to medically monitor Ms. Lines's withdrawal process, Defendant Nhi Ngoc Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES # 5-10 made intentional decisions not to treat Ms. Lines's serious medical needs.  Defendants' failure to treat Ms. Lines's withdrawals put her at substantial risk of suffering serious harm by not taking the reasonable available measures to reduce the risk of serious harm.  Under the circumstances alleged above, a reasonable medical professional would have understood the high degree of risk involved, making Defendants' inaction obviously unreasonable.

149.    Similarly, DOE Deputies #1-4 failed to perform proper cell checks and failed to summon medical care. Each DOE Deputy recognized that Ms. Lines had been begging for medical help relating to withdrawals. They were advised by Ms.

30

COMPLAINT

Lines that she was seizing, vomiting, having difficulty breathing, and on the verge of passing out. Each of these pleas went ignored. Moreover, based on the facts alleged, had DOES #1-4 performed adequate and proper safety checks, they would have observed Ms. Lines in serious medical distress and would have immediately summoned medical care. Those continual failures amount to deliberate indifference.

150.   During all relevant times, each Defendant was acting under color of state law as deputies and/or medical personnel at LCDC.

151.   As an actual and proximate cause of Defendants' deliberate indifference to Ms. Lines's health and safety, Ms. Lines suffered (1) damages prior to her death, including those arising from her pre-death pain and suffering, and (2) death valued in the loss of Ms. Lines's life. As such, Ms. Lines's Successor in Interest seeks compensatory damages for this harm.

152.   Defendants and DOES #1-10 acted with deliberate and reckless disregard of Ms. Lines's constitutional rights. Plaintiffs thus seek an award of punitive damages against all individual Defendants in an amount to be proven at trial.

153.   Plaintiffs are also entitled to costs and reasonable attorney's fees under 42 U.S.C. section 1988.

**VI.**

**SECOND CAUSE OF ACTION**

**42 U.S.C. Section 1983 – 14th Amendment – *Monell* Municipal and Entity Liability for Constitutionally Inadequate Substance Intoxication and Withdrawal Policies and Protocols**

**[By All Plaintiffs Against County of San Diego, Naphcare, and CHP]**

154.   Plaintiffs reallege and incorporates by reference all paragraphs stated above, as though fully set forth herein.

155.   Due to San Diego County's horrific in-custody death rate over the last ten years, which has been publicized by Grand Jury reports, and other watch dog

31

COMPLAINT

group reports, the California State Auditor issued a scathing report regarding San Diego County jail deaths.  The Auditor found that San Diego County jails had the **most** in-custody deaths than any other county in California.  The Auditor found the County "failed to adequately prevent and respond to the problem and called for legislative action" to force the County to incorporate nationally recognized standards to prevent foreseeable deaths.

156.   The report stated, "The high rate of death in San Diego County jails compared to other counties raises concerns and suggests that **underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody**."  After a thorough inspection of the jail and an audit of its policies, the Auditor concluded, "**significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails.**"

157.   The County is also well aware that drug use among individuals in custody in San Diego County jails is ai an all-time high. For instance, in 2021, a staggering 83% of adult arrestees tested positive for at least one controlled substance.

158.   The Bureau of Justice Assistance's Guidelines for Managing Substance Withdrawal in Jails states: "Death and suffering due to withdrawal from opioids, alcohol, and other substances are preventable. Local government officials, jail administrators, correctional officers, and health care professionals have an opportunity to save lives and promote the wellbeing of individuals in jail, an opportunity bound by legal obligations set forth in the Americans with Disabilities Act and various federal civil rights acts."

159.   To begin, based on a review of the withdrawal policies, according to Kelly S. Ramsey, a substance abuse expert retained in the *Dunsmore* matter, "It appears that responsibility for acute withdrawal management is spread across multiple organizations in the jails, but it is unclear which policies actually govern

32

COMPLAINT

acute withdrawal management. San Diego County staff have a role to play, as does NaphCare, a medical contractor in the jail, as well as Correctional Healthcare Partners ("CHP"), another medical contractor with an evolving role in the Jail. I reviewed the transcripts of relevant "Person Most Knowledgeable" ("PMK") depositions of San Diego County and NaphCare, as well as the transcript of the deposition of Dr. Peter Freedland, the Chief Executive Officer of CHP, in order to understand how withdrawal is managed in the Jail. Those transcripts reveal that there is a great deal of confusion across those organizations about how withdrawal is supposed to be managed by policy and how it is actually managed in practice. That confusion creates a substantial overarching risk that incarcerated persons experiencing withdrawal will not get adequate care."

160. According to Dr. Ramsey, "The policy includes vague descriptions of the screening and assessment procedures for persons entering the Jail who may be at risk of opioid withdrawal. It primarily focuses on addressing access to methadone for a person that is admitted to the Jail. It provides very little insight or oversight to correctional staff regarding appropriate assessment, monitoring, and care for a person with substance use…"

161. At Las Colinas Detention Facility (LCDF), the screening process is conducted by County employed nurses. After screening, responsibility for withdrawal management shifts to NaphCare and CHP. According to Dr. Ramsey, "The County and NaphCare do not staff enough nurses or other clinicians in the Jail to provide all withdrawal management onsite, so NaphCare uses an internal process that it has labeled "STATCare" to make up the difference. The word "STATCare" may sound like a technology product, but it is just a process by which NaphCare offloads treatment decisions to remote clinicians who are not physically present in the San Diego County jails – or even in California at all." For cost-saving purposes, Naphcare punts clinical decision making to out of state medical providers. Essentially, a nurse in the jail sends patient records to an off-site clinician who

COMPLAINT

makes treatment decisions based on those records without actually examining the patient. According to Dr. Ramsey, "This process, in general, does not meet the standard of care for withdrawal management because acute withdrawal management is nuanced and the potential harms of unrecognized or underrecognized acute withdrawal symptoms include seizures, delirium tremens, severe dehydration, and death. Relying only on a remote chart review of a person gives an inadequate and incomplete picture of the person. A telehealth visit, if one occurs at all, is inappropriate for these encounters because they require a hands-on physical examination in order to glean critical data that can only be obtained through direct physical contact. It is inappropriate for NaphCare's remote clinicians to rely solely on charts put together by nurses who – for the reasons explained below – are not adequately trained on withdrawal screening. Acute withdrawal management is a clinical situation where telehealth visits are not appropriate. Potentially life-threatening health conditions like acute withdrawal cannot be treated adequately remotely."

162. After a review of thousands of patient records in the *Dunsmore* matter, Dr. Ramsey concluded that the County, Naphcare and CHP failed to timely and adequately screen and monitor inmates on the COWS or CIWA protocols. Records show screenings are only done once per day unlike the standard protocols which requires at least three screening assessments per day, sometimes more depending on the severity of the withdrawals.

163. Dr. Ramsey also found that the County, Naphcare, and CHP failed to train or require medical providers to take a patient's vitals every time a screening assessment is performed. Dr. Ramsey concluded—as played out in the instant case—that any screening assessment that fails to take an inmate's vitals in inadequate.

164. Regarding delayed or tapered medications, at-issue in this case, Dr. Ramsey found, "The Jail has previously implemented a practice of using fixed

34

COMPLAINT

medication tapers, which means that persons being treated for a withdrawal syndrome were all treated with the same dose of medication which is tapered at the same time interval regardless of the symptoms they are experiencing and their response to said treatment. That meant clinical assessment and reassessment were not factored into acute withdrawal management in the Jail. Particularly for opioid use disorder, a taper off medication for opioid use disorder after acute withdrawal management is not appropriate care. Per the BJA Guidelines, 'Opioid withdrawal management without ongoing pharmacotherapy does not treat the underlying OUD and leaves the patient at risk for overdose and death.' Frequently in the reviewed patient charts, medical provider directions were 'detox with medication taper' which triggered a fixed clinical course of action for the patient regardless of their clinical response to the medication. In medicine, that is not how evidence-based care and best practice work. Patients need constant reassessment using clinical guidelines and treatment tailored to individuals' needs and plans altered based on clinical reassessment and clinical parameters. The Jail did not regularly reassess patients."

165.   Dr Ramsey found "The Sheriff's Department's dosing of buprenorphine is outdated and has not been updated to address significant opioid tolerance associated with fentanyl and other highly potent synthetic opioids (HPSO) in the unregulated drug supply." In other words, because inmates like Ms. Lines are addicted to highly potent synthetic opioids, such as fentanyl, "Some patients with high opioid tolerance may require buprenorphine doses above 24 mg/d during treatment stabilization."

166.   According to the operative policies and procedures, the Jail limits doses of buprenorphine to 16 mg daily, "given lack [of] proven efficacy to buprenorphine doses over 16 mg." According to Dr. Ramsey, "This is inaccurate and, increasingly so, with the dominance of HPSO in the unregulated drug supply. With too low of a dose of buprenorphine, individuals can experience protracted

35

COMPLAINT

opioid withdrawal syndrome and opioid cravings which risks a return to use and subsequent nonfatal or fatal overdose."

167.    Here, Defendants not only delayed and tapered the medication, but they also failed to individually assess Ms. Lines needs to determine if she required different medication management based on her individual needs.

168.    In sum, with regards to the County, Naphcare and CHP's *written* policies, Dr. Ramsey opined, "The Jail's written policies regarding acute withdrawal management are inadequate to meet the standard of care. They are broadly not well informed regarding current practices for acute withdrawal management and are overly vague. Discretion is given to clinicians and other staff with respect to monitoring and medicating individuals; however, staff do not appear to be well trained or well-informed regarding addiction medicine. In addition, the Jail's system for withdrawal management is convoluted with no uniform policies and procedures for all staff to follow." Dr. Ramsey continues, "In general, the Jail's approach to addressing withdrawal is reactive, rather than proactive, with no indication of individualized care, assessment, or dosing. It is my opinion that the Sheriff's Department fails to provide persons in withdrawal with individualized care, thereby placing them at risk of serious harm."

169.    As for non written policies, according to the State Auditor's report, and findings issued by Citizen Law Enforcement Review Board, prior to Ms. Lines's death, the County maintained *de facto* policies or widespread, longstanding practices or customs failing to provide critical treatment to individuals suffering from substance withdrawal, i.e., withdrawal from drugs and/or alcohol.

170.    Upon information and belief, the written policy on substance withdrawal was deficient on its face.  It did not sufficiently identify the nursing requirements for treatment of withdrawal or the required timetable to treat such withdrawals. This deficiency was known to the County prior to Ms. Lines's death.

171.    Specifically, the written policy was deficient on its face on when, and

36

COMPLAINT

under what circumstances, nurses were required to refer the patient to a doctor, or when to transport the patient to the hospital, or when to administer the withdrawal medications.  Furthermore, the policy was deficient in that it failed to provide guidelines as to when and how to medically monitor inmates who should have been placed on the COWS and/or CIWA-Ar protocols.

172.   Moreover, the County failed to promulgate adequate policies and protocols to delay with the frequent and recurring situation of incoming inmates who abuse stimulant drugs. The County has not established policies and protocols regarding treatment and monitoring of individuals who are known to be at risk of stimulant intoxication and/or withdrawal. For example, even though all medical personnel were aware that Callen Lines tested positive for amphetamines and methamphetamine, they did nothing to evaluate, assess, or treat her for possible stimulant intoxication and/or withdrawal. There is no policy or procedure for assessing, monitoring, or treating individuals, such as Callen Lines, known to be at risk of stimulant intoxication and withdrawal.

173.   In addition, there was a *de facto* policy of allowing its staff to fail to render care to patients going through withdrawal and ignoring obvious and dangerous symptoms such as persistent vomiting and diarrhea.  There was an additional *de facto* policy of leaving inmates in their cell unattended who were known to be detoxing and suffering from withdrawals.

174.   Upon information and belief, there was a permanent, widespread, well-settled practice or custom of Defendant to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates are in need of medical care.

175.   There was a permanent, widespread, well-settled practice or custom of Defendant to deny timely administration of medication to inmates suffering from serious medical condition and failing to ensure that medication was timely and properly administered to inmates.

37

COMPLAINT

176. There was a permanent, widespread, well-settled practice or custom of of failing to train staff to timely treat, monitor, and medicate inmates housed in detox modules. Based on information a belief, despite written policies requires a higher level of treatment and monitoring, inmates housed in detox modules are often ignored. They are not monitored or medicated but once a day.

177. The above customs and practices were based on the County's custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care. The County maintained a custom and practice of assuming an inmate was "lying" and seeking "secondary gain." This permitted the County and its employees to deny inmates suffer from withdrawals medical care. This led to a widespread practice of failing to properly check on the welfare of inmates, even those inmates known to have serious medical needs, including conducting proper cell checks of inmate known to be suffering from withdrawals, as required by County's own written policies.

178. The County's longstanding practices or customs were unconstitutional in that they were deliberately indifferent to a substantial risk of serious harm to inmates known to be withdrawing from drugs and alcohol.

179. Prior to Ms. Lines's preventable death, the following inmates were denied treatment and monitoring for their know and pending drug withdrawals:

a. Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal. Had jail staff treated and medically monitored Mr. Diaz's withdrawal process, he would still be alive;

b. On June 25, 2011, Daniel Sisson died from complications made worse by drug withdrawal. The jail staff had failed to monitor Mr. Sisson despite his known withdrawals;

c. In September of 2014, Ronnie Sandoval died in the Jail based on similar failures on the part of medical personnel. Mr. Sandoval

38

COMPLAINT

showed obvious symptoms of overdose, sweating profusely, and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs. The nursing staff did not offer Mr. Sandoval any further medical attention. Mr. Sandoval died later that same day;

d. Jeremy Thomas, a 28-year-old former Marine died May 29, 2019, after he had been booked on drug charges. Mr. Thomas lost his hand in Afghanistan in 2011 and was featured in a Union-Tribune story two years ago about veterans being over-prescribed opioids for pain. Mr. Thomas told medical staff that he was going through withdrawal. Rather than treating him for withdrawals and monitoring him, he was sent to his cell without treatment. Shortly after, he was pronounced dead;

e. In January of 2020, deputies failed to conduct a mandatory safety check on an inmate struggling with drug addiction. CLERB found that the deputy who was supposed to conduct "proof of life" checks in Blake Wilson's module spent "approximately one second" looking into Wilson's three-person cell. More than eight hours passed between the time Wilson was last seen alive and when he was found dead;

f. In November of 2019, Elisa Serna admitted to medical staff that she was addicted to heroin. Ms. Serna was given Zofran, an anti-nausea medication, but was not placed on the COWS protocol and was not administered associated medications, nor was her withdrawal process medically monitored. Serna was not administered withdrawal medication until her fourth day in jail and died the following day.

g. The death of Elisa Serna on November 11, 2019, placed the Sheriff's Department on notice regarding woeful inadequacies in the care and

39

COMPLAINT

treatment of individuals suffering from substance withdrawal. After Ms. Serna's death, Jon Montgomery, the Chief Medical Officer of the Sheriff's Department, conducted a review of Ms. Serna's death. Dr. Montgomery concluded that Ms. Serna was withdrawing from alcohol, opioids, and benzodiazepine while she was detained and before her death. Although Ms. Serna was withdrawing from alcohol, opioids, and benzodiazepine, no withdrawal protocol was implemented.

h. Dr. Montgomery noted in his review of Ms. Serna's death that the clinical policies were "ineffective." Although Ms. Serna had been "recognized as a candidate for a withdrawal protocol" Dr. Montgomery wrote that "[m]edications/withdrawal protocol [were] not implemented." Dr. Montgomery observed "poor documentation" made the case "hard to fully evaluate . . . Room for improvement." Dr. Montgomery stated that the medical response to Ms. Serna could have been improved. In terms of improving care, Dr. Montgomery observed that nursing staff should be trained in "cultural awareness regarding compassion and 'taking things for granted.'" Dr. Montgomery explained that "taking things for granted" referenced the notes that Ms. Serna was faking symptoms or malingering. Medical providers had allowed themselves to be "influenced by commentary, rumor, what have you, rather than responding to the facts at hand and the patient presenting in front of [them]."

i. In the *Estate of Elisa Serna* matter, Dr. Homer Venters, the Serna Plaintiffs' correctional medicine expert, opined the "San Diego County Sheriff's Department's failure to implement a system of regular monitoring of withdrawal severity, using COWS and CIWA or similar scoring tools, and its failure to implement a system of care based on the severity of withdrawal, were serious and deadly deficiencies that

40

COMPLAINT

led to Ms. Serna's ultimate demise." Dr. Venters noted that because COWS and CIWA were not required to be used, nursing staff failed to regularly monitor Ms. Serna for the signs and symptoms of alcohol, opioid, and benzodiazepine withdrawal. "Although some of the elements that are part of those assessment tools were measured, they were not repeated in a consistent manner or in a consistent frequency, and some important elements were missed all together. This resulted in a collective failure to appreciate the severity of Ms. Serna's withdrawal and the worsening of her symptoms." Worse still, rather than objectively measure the progression of her withdrawal using COWS and CIWA, the health staff dismissed Ms. Serna as faking or exaggerating her symptoms of withdrawal, such as faking fainting spells and self-inducing vomiting.

j.   On March 16, 2022, Hayden Schuck died from drug withdrawals. Despite advising medical staff that he used drugs daily, he was not provided withdrawal medications and was not medically monitored during the first week of his detainment. During his detainment Mr. Schuck displayed signs and symptoms of withdrawal which were known to medical staff but were ignored and untreated.

k.   In July of 2022, Vianna Granillo admitted to medical staff that she was addicted to opiates and alcohol and was a daily user. Ms. Granillo was not screened nor was she placed on the COWS/CIWA protocol. Ms. Granillo was not administered associated medications, nor was her withdrawal process medically monitored. Ms. Granillo was not administered withdrawal medication until her fourth day in jail and died the following day.

180.   In 2017, the Sheriff's Department invited the National Commission on Correctional Healthcare to tour the San Diego County jail facilities and evaluate the

41

COMPLAINT

delivery of medical care within the jails.  Because the Sheriff's Department sought accreditation by the NCCHC, the Department requested the NCCHC's review team to assess the County jails and provide recommendations for improvement. Although the Sheriff's Department's jails have not yet achieved NCCHC accreditation, according to public statements by Sheriff Kelly Martinez, it remains a goal of the Department.

181.   The NCCHC issued a report in January 2017 noting the failure of the Sheriff's Department to meet the NCCHC standards required for accreditation. Relevant to this case, the NCCHC noted that the Sheriff's Department's standardized nursing protocols (SNPS) for alcohol withdrawal had not been reviewed since July 10, 2008.  The SNP was based on references to four articles.

182.   The NCCHC concluded the Sheriff's Department failed to meet all compliance indicators for the NCCHC's standards for intoxication and withdrawal policies.  It stated the Sheriff's Department failed to the NCCHC's standards because its protocols for treatment of drug and alcohol withdrawal were not consistent with national standards.  See NCCHC Technical Assistance Report, pp. 95-96.

183.   In the matter of *Estate of Elisa Serna et. al. v. County of San Diego et al.*, Southern District of California case no. 20-cv-2096-BAS-DDL, the Serna plaintiffs deposed Defendant Dr. Montgomery, the Sheriff's Department's Chief Medical Officer.  Dr. Montgomery testified at this deposition that he agreed with the NCCHC's statement that clinical management of withdrawal should include the use of validated withdrawal assessment instruments such as COWS and CIWA-A.

184.   The NCCHC's standard for intoxication and withdrawal, including a description of its requirements for compliance, states in relevant part:

> Detoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience.  As a precaution, severe withdrawal syndromes must never be managed outside of a hospital.  Deaths from acute intoxication or severe

42

COMPLAINT

withdrawal have occurred in correctional institutions.  In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times. **Clinical management should also include the use of validated withdrawal assessment instruments, such as the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale in cases of opiate withdrawal, and the Clinical Institute Withdrawal Assessment of Alcohol Scale, Revised, in the case of alcohol withdrawal.** NCCHC 2014 Guidelines for Intoxication and Withdrawal p. 125 (emphasis added).

185. Further, Plaintiffs specifically incorporate by reference the Second and Third Amended Civil Class Action Complaints for Declaratory and Injunctive Relief, Doc. Nos. 81 and 231, in *Dunsmore v. San Diego County Sheriff's Department et al*, 20cv00406-AJB.

186. Had the County addressed known deficiencies within its jails and made changes in order to comply with nationally recognized standards earlier, these changes could have saved Ms. Lines' life.

187. Moreover, beginning in 2022, Naphcare was entrusted with the responsibility of developing and implementing constitutionally appropriate treatment protocols for substance use withdrawal.

188. Due to Naphcare's failure to provide constitutionally adequate treatment, including implementation of adequate withdrawal policies, protocols, and training, in 2024 the County and Naphcare subcontracted with CHP. Based on information and belief, CHP was also responsible for implementing policies and protocols as well as with staffing medical providers in County jails to provide treatment according to the County's policies and training.

189. The County of San Diego, Naphcare and CHP's written policy for treatment and monitoring of substance withdrawal was deficient in its failure utilize scoring scales such as CIWA-Ar and COWS.  The policy failed to specify the dosage and administration of medication to deal with the symptoms of withdrawal. It was deficient in its failure to address protocol for vomiting and dehydration,

43

COMPLAINT

which can be fatal. The policy failed to specify the timing of monitoring intervals depending on the COWS or CIWA-Ar score.

190. The County of San Diego, Naphcare and CHP's written policy was deficient on its face on when nurses were required to refer the patient to a doctor or when to transport the patient to the hospital.

191. The written policy was deficient on what type of treatment to administer depending on the CIWA or COWS score of the patient.

192. In addition, there was a de facto policy of allowing its staff to fail to render care to patients going through withdrawal and ignoring obvious and dangerous symptoms such as persistent vomiting.

193. The County's and Naphcare's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a custom that authorized or condoned the misconduct of deputies, nurses, and other medical personnel.

194. Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendants was to deny treatment to inmates in serious medical distress and to refuse to transfer seriously ill inmates to a higher level of care, such as an emergency department, to save money on costs.

195. There was a policy and practice for subjecting clinical leadership to the demands and oversight of command leadership who had no experience or background in the provision of medical and mental health care. The structure and organization of the Detentions Services Bureau within the Sheriff's Department prevented implementation of effective clinical policies and protocols, including timely deployment of the COWS and CIWA-Ar scoring scales, monitoring programs, and treatment protocols.

196. There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

197. There was a custom and practice of assuming a patient was "lying" or

44

COMPLAINT

seeking "secondary gain" and denying patients medical care.

198. There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies, even when the serious medical needs of inmates were properly identified and recorded during intake.

199. There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious medical needs

200. There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

201. The County of San Diego, Naphcare and CHP's training policies and protocol were not adequate to train its medical staff to handle the usual and recurring situations with which they must deal, including: (1) providing proper protocol for patients going through withdrawal; and (2) seeking immediate medical and psychiatric care for inmates in obvious distress.

202. Treating patients going through withdrawal is a usual and recurring situation in the San Diego County Jails.

203. The County of San Diego, Naphcare and CHP were deliberately indifferent to the widespread unconstitutional acts by its jail staff and failed to set forth appropriate policies regarding the treatment of inmates. The County and Naphcare knew their failure to adequately train their staff made it highly predictable that its jail staff would engage in conduct that would deprive persons such as Ms. Lines of her rights.

204. Based on the above allegations, the County, by and through its supervisors and policymakers, were aware of a perpetual pattern of preventable in-custody deaths caused by Defendants' systemic and wide-ranging failures to treat and monitor inmates known to be suffering from drug withdrawals.

205. The unlawful and illegal conduct of each Defendant, including the County of San Diego, Naphcare, and CHP, deprived Ms. Lines of the rights,

45

COMPLAINT

privileges and immunities secured to her by the Constitutions of the United States.

206.   As a direct, proximate, and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

## VIII.

## <u>THIRD CAUSE OF ACTION</u>

**42 U.S.C. Section 1983 – 14th Amendment – Failure to Train, Supervise, and Discipline (*Monell*)**

**[By All Plaintiffs Against County of San Diego, Naphcare, and CHP]**

207.   Plaintiffs reallege and incorporates by reference all paragraphs stated above, as though fully set forth herein.

208.   The Auditor's report stated, "The high rate of death in San Diego County jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices undermined its ability to ensure the health and safety of the individuals in its custody."  After a thorough inspection of the jail and an audit of its policies and practices, the Auditor concluded, "significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails."  **One of those deficiencies was the County's inadequate drug withdrawal policy and related training.**

209.   The County, Kelly Martinez; Theresa Adams; Christopher Buchanan; Kyle Bibel; Jon Montgomery, D.O., Serina Rognlien-Hood, Naphcare, Peter Freedland, CHP and other DOES 11-15 are policymakers and supervisors that failed to properly supervise their employees and independent contractors with respect to the dangers of dehydration and withdrawal despite their personal knowledge of the dangers of withdrawal syndrome.  These defendants knew withdrawal syndrome can occur with discontinuation of non-opioid substances as well, and other medications used to treat the gastrointestinal symptoms associated with opiate withdrawal.  Defendants knew that withdrawals and/or dehydration

46

COMPLAINT

could be fatal and that there had been prior deaths including those referenced in the foregoing paragraphs.

210. These defendants were personally aware of the repeated Constitutional violations committed by their subordinates vis a vis a pattern of refusal to provide medical care to inmates known to be withdrawing.

211. The Auditor also found, "There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails."

212. These Defendants failed to properly train, supervise, and discipline their subordinates regarding identification of substance withdrawal, and proper treatment of substance withdrawal.

213. Supervisory Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

214. Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails related to inadequate provision of medical care, and failed to properly supervise and discipline their employees or agents.

215. Each Defendant received information regarding the horrific nature of Elisa Serna and Vianna Granillo's death, including the denial of medical care and the failure to adequately treat their withdrawal from drugs and alcohol. Each Defendant received emails, or attended meetings, where the failures and misconduct of subordinates in Ms. Serna's case was discussed, including the failure of deputies to recognize the signs and symptoms of withdrawal and the failure of nurses and doctors to adequately monitor and treat withdrawal.

216. Defendant Serina Rognlien-Hood was the Director of Nursing at all times relevant to this complaint. Ms. Rognlien-Hood was intimately aware of the failures of the nurses and deputies, and their misconduct, which contributed to the

47

COMPLAINT

death of Elisa Serna in November 2019 and Vianna Granillo in 2022.  She testified at the *Serna* preliminary hearing in the criminal prosecution of nurse Danalee Pascua and doctor Frederike Von Lintig who were responsible for Ms. Serna's care. *See People of the State of California v. Danalee Pascua and Friederike Von Lintig*, San Diego County Superior Court case no. CE409255.  During the preliminary hearing, Ms. Rognlien-Hood testified that, based on her review of Ms. Serna's medical chart, "everybody believed" Ms. Serna had not actually suffered any seizure on November 11, 2019.  Video evidence, in fact, showed Ms. Serna repeatedly suffering seizures, often times in front of deputies and nurses who believed she was faking the seizures.  Ms. Rognlien-Hood also testified at the criminal trial that nurse Pascua's conduct violated Sheriff's Department policies and procedures.

217.  Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.  Supervisory Defendants were all directly aware of the failure to adequately train, supervise, and discipline both medical personnel and deputies in the Elisa Serna case, which led to her death.  Despite their knowledge, the County and each Supervisory Defendant failed to take corrective action.

218.  Beyond Ms. Serna, each Defendant, including Naphcare, CHP, Freedland, and DOES 11-15, were aware of the history of deaths of inmates at the San Diego Jails related to the failure to provide adequate medical care to inmates known to be suffering from withdrawal.  Defendants and other DOE supervisors and policymakers were aware of previous inmate deaths caused (as outlined above) by the failure of contractors and contract medical staff to provide medical care to inmates addicted to drugs.  Defendants and other DOE supervisors and policymakers were aware of the need to closely monitor and

48

COMPLAINT

supervise the medical staff and to ensure that they understood their responsibilities and job function in a correctional setting.

219.   Additionally, the County of San Diego, Naphcare, CHP, and Freedland failed to adequately train and supervise its subordinates and/or independent contractors at the jail in properly and timely administering medication ordered to be given to seriously ill inmates. In the matter of the Estate of *Michael Wilson v. County of San Diego et al.*, relating to the death of Michael Wilson at the Central Jail in February 2019, the district court wrote as follows:

> Despite knowing that some inmate-patients may suffer from serious medical needs and that some may not receive their essential medications in some instances, the County apparently established no procedure requiring medical personnel to check if an inmate-patient with serious medical needs missed previous doses of prescribed medication. That was true even if the inmate-patient or their family notified medical personnel that they had not received their medications. The jury could conclude that it should have been obvious to the County that such an omission could likely result in constitutional violations. . . . Thus, there is a genuine dispute of material fact as to whether the County's failure to establish a policy to check whether inmate-patients with serious medical needs missed any of their prescribed medications, particularly where medical personnel were put on notice of that possibility, constituted deliberate indifference to their constitutional rights. *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 20-CV-00457-RBM-DEB, 2023 WL 8360718, at *29 (S.D. Cal. Dec. 1, 2023)

220.   The training policies of Defendant County, Naphcare, and CHP were not adequate to train its medical staff to handle the usual and recurring situations with which they must deal, including: (1) providing proper protocol (medication and monitoring) for patients going through withdrawal; (2) promptly providing necessary medication to seriously ill inmates particularly when doctors ordered the medication to be administered; and (3) seeking immediate medical and psychiatric care for inmates in obvious distress.

221.   Treating patients going through substance withdrawal is a usual and recurring situation in the San Diego County Jails.  Providing medication to

49

COMPLAINT

seriously ill inmates is a usual and recurring situation in San Diego County Jails.

222.   All Defendants, including the County, Naphcare, CHP, and Freedland were deliberately indifferent to the widespread unconstitutional acts by its jail staff and failed to set forth appropriate policies and training regarding the treatment of inmates suffering from withdrawal and medical distress, in general.  The County, Naphcare, and CHP knew its failure to adequately train its staff made it highly predictable that its jail staff would engage in conduct that would deprive persons such as Ms. Lines of her rights.

223.   During the relevant period, all Defendants and DOES were acting pursuant to the policies, customs, and training of Defendant County, and were operating under the color of law.

224.   Defendants and DOES 11-15 failed to properly train its jail staff to treat and monitor inmates suffering from drug withdrawal.  Upon information and belief, DOE supervisors and policymakers, who were responsible for training jail staff, also failed to supervise and disciple staff as it related to treatment for inmates suffering from withdrawals.

225.   As alleged above, each Defendant, knew of its failure to properly train and supervise its jail staff to treat and monitor inmates suffering from withdrawals.

226.   Had Defendants and DOES 11-15 addressed these known deficiencies in order to comply with nationally recognized standards earlier, these changes could have saved Ms. Lines's life.

227.   Based on the above allegations, Defendants and DOES 11-15, were aware of a perpetual pattern of preventable in-custody deaths caused by Defendants' systemic and wide-ranging failures to train its medical and correctional staff to treat and monitor inmates known to be suffering from drug withdrawals.

228.   As a result of the County, Kelly Martinez; Theresa Adams; Christopher Buchanan; Kyle Bibel; Jon Montgomery, D.O., Serina Rognlien-Hood and other DOE policymakers (DOES #11-15) continued failure to properly train,

supervise and discipline its jail staff, Defendant County, and supervisors and policymakers, were deliberately indifferent to the needs of Plaintiff.  The failure to train, supervise and discipline was the moving force behind the misconduct of all individually named Defendants, including DOES, and the resulting pain and suffering and death.

229.   The unlawful and illegal conduct of each Defendant deprived Ms. Lines of the rights, privileges and immunities secured to her by the Constitutions of the United States.

230.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Ms. Lines.  The failure to supervise and discipline was the moving force, and the direct, proximate and foreseeable result, behind the misconduct of the deputies, the denial of medical care to Ms. Lines, and her resulting pain and suffering and subsequent death.

231.   In committing the acts alleged above, the private entity Defendants Naphcare and CHP acted grossly and/or maliciously and/or were guilty of a wanton and reckless disregard for the rights and feelings of all inmates in need of medical assistance and by reason thereof Ms. Lines's heir is entitled to exemplary and punitive damages in an amount to be proven at trial.

## IX.

## FOURTH CAUSE OF ACTION

**42 U.S.C. Section 1983 – 14th Amendment Due Process – Deprivation of Familial Association**

**[By R.G.L. and E.M.L., through their Guardian *Ad Litem*; Richard Lines III; and Daniel McCarthy Against Nhi Ngon Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, and DOES #1-15]**

232.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

51

COMPLAINT

233. The Ninth Circuit recognizes that a parent and child have a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her parent. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). This liberty interest is rooted in the Fourteenth Amendment, which states in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

234. The protected liberty interest is independently held by both parent and child. *City of Fontana*, 818 F.2d at 1418. A parent's right includes a custodial interest (but only while the child is a minor), and a companionship interest (even after a child reaches the age of majority). *Id*. at 1419; see, e.g., *Strandberg v. City of Helena*, 791 F.2d 744, 748 n.1 (9th Cir. 1986)

235. All Defendants' failures hereinabove described were so egregious and outrageous it would shock the contemporary conscience of society as each Defendants' conduct was deliberately indifferent to Ms. Lines's constitutional right to adequate medical care.

236. As such all Defendants, and DOES 1-15, are liable for the damages associated with Plaintiffs' loss of familial association.

## X.

## FIFTH CAUSE OF ACTION

## BANE ACT (Civ. Code, §52.1)

**[By Estate of Callen Lines Against Nhi Ngon Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, the County of San Diego, Naphcare, CHP and DOE Defendants 1-15]**

237. Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

238. The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment …

52

COMPLAINT

of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (§ 52.1, subd. (a); see id., subd. (b).) "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal.App.4th 860, 883 (2007).

239.   In the Ninth Circuit, as it relates to Bane Act claims relating to inadequate medical care in a correctional setting, controlling law states, with regard to coercive conduct, "at the pleading stage, the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct." *M.H. v. County of Alameda* (N.D. Cal. 2013) 90 F. Supp. 3d 889, 898 Courts have equated the "[t]hreat, intimidation, or coercion" requirement to "intentional . . . conduct." *Id.* at 898. "That intent requirement is satisfied where the defendant allegedly acted with '[r]eckless disregard of the right at issue.'" *Cornell v. City and County of San Fransisco* (1st Dist. 2017) 17 Cal. App. 5th at 804.

240.   As alleged above, Ms. Lines died as a result of unconstitutional conduct by Defendant County of San Diego, Naphcare, and CHP's employees/supervisors, named individually above, including thier deliberate indifference to the serious and obvious risk to Ms. Lines's health and safety. This deliberate indifference to Ms. Lines's health and safety constituted a violation of California Civil Code, section 52.1, as (1) the County, Naphcare, and CHP's employees violated and interfered with Ms. Lines's Due Process rights under the Fourteenth Amendment to the U.S. Constitution by intentionally failing to administer COWS and CIWA-Ar medication, medically monitor Ms. Lines's withdrawal process, summon medical care, and conduct the welfare check and direct-view safety checks; (2) those employees acted with reckless disregard to Ms. Lines's constitutional rights; and (3) the employees' intentional failure to safeguard

53

COMPLAINT

their detainee from the obvious risk of harm was inherently coercive within the meaning of section 52.1. *See Lapachet v. California Forensic Medical Group, Inc.*, 313 F.Supp.3d 1183, 1195 (E.D. Cal. 2018).

241. This violation of section 52.1 was the proximate cause of Ms. Lines's pain, suffering, and death, which were the direct and foreseeable consequences of the unlawful conduct committed by the County, Naphcare, and CHP's employees, Defendant Nhi Ngon Dai, Jarell Sanchez, Jillaine Smasal-Kwak, Owen Gambiza, Kelly Martinez; Theresa Adams; Christopher Buchanan; Kyle Bibel; Jon Montgomery, D.O.; Serina Rognlien-Hood; Peter Freedland, and DOE Defendants 1-15.

242. Because each Defendant acting within the scope of their employment with the San Diego County Sheriff's Department, Defendant County of San Diego is liable for the damages arising from the officers' violation of section 52.1. *See* Cal. Civ. Code § 52.1(n) ("The state immunity provisions provided in Sections 821.6, 844.6, and 845.6 of the Government Code shall not apply to any cause of action brought against any peace officer or custodial officer . . . or directly against a public entity that employs a peace officer or custodial officer, under this section.") (subdivision (n) effective on Jan. 1, 2022); *see also* Cal. Gov. Code § 815.2.

243. Similarly, because each Defendant (Nhi Ngoc Dai, Freedland and DOES #11-15) acting within the scope of their employment/agency with Naphcare and CHP, they too are liable for the damages arising from the officers' violation of section 52.1. *See* Cal. Civ. Code § 52.1(n) ("The state immunity provisions provided in Sections 821.6, 844.6, and 845.6 of the Government Code shall not apply to any cause of action brought against any peace officer or custodial officer . . . or directly against a public entity that employs a peace officer or custodial officer, under this section.") (subdivision (n) effective on Jan. 1, 2022); *see also* Cal. Gov. Code § 815.2.

244. Plaintiff seeks compensatory damages for the harm Ms. Lines suffered

COMPLAINT

before her death, *including pain and suffering.* *See* Cal. Civ. Proc. Code § 377.34(b) (as amended, effective Jan. 1, 2022). Plaintiff also seeks the statutory remedies set forth by sections 52 and 52.1 of the California Civil Code, including treble damages and attorney's fees.

## XI.

## SIXTH CAUSE OF ACTION

**Negligence (CCP § 377.30) and Wrongful Death (CCP § 377.60)**

**(By Plaintiffs Estate of Callen Lines, Richard Lines III, R.G.L., and E.M.L**

**Against All Defendants and DOES 1-15)**

103. Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

104. As set forth above, in light of the special relationship between a pretrial detainee and those medical personnel and correctional deputies in charge of the detainee's health and safety, all Defendants and DOES 1-15 owed decedent Callen Lines a duty of reasonable care.

105. Each Defendant breached that duty by failing to implement and/or follow the CIWA and COWS protocols; failing to administer medication for withdrawal; failing to monitor Ms. Lines's withdrawal; failing to summon care; and failing to conduct proper safety checks knowing Ms. Lines was suffering from alcohol and opiate withdrawal.

106. Each Defendants' negligence was the proximate cause of Ms. Lines's pain, suffering, and death, which were direct and foreseeable results of that negligent conduct.

107. Furthermore, California Government Code section 845.6 creates an affirmative duty for jail staff to furnish or obtain immediate medical care for a prisoner in their custody when the jailer knows the inmate is in serious medical distress. *See* California Government Code section 820(a).

108. And as also set forth above, each Defendant breached that duty by

55

COMPLAINT

failing to administer COWS medication, summon medical care, perform a welfare check on Ms. Lines, even though any reasonable medical professional or correctional deputy would have understood the high degree of risk to a detainee's health and safety from failing to conduct those welfare and safety checks in the detox dorm.

109.   Each Defendants' negligence was the proximate cause of Ms. Lines's pain, suffering, and death, which were direct and foreseeable results of that negligent conduct.

110.   The Estate of Callen Lines seeks compensatory damages for the harm Ms. Lines suffered before her death, *including pain and suffering*. Recently amended Section 377.34, subdivision (b), of the California Code of Civil Procedure provides: "Notwithstanding subdivision (a), in an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference pursuant to Section 36 before January 1, 2022, or was filed on or after January 1, 2022, and before January 1, 2026."

111.   Under the California law, Plaintiffs Richard Lines III, Ms. Lines' husband, and her minor children, R.G.L. and E.M.L., have standing to assert a cause of action for the wrongful death of their wife and mother, respectively. *See* Cal. Civ. Proc. Code § 377.60(a).

112.   As alleged above, Ms. Lines died as a result of tortious conduct by all Defendants, as individual actors, and by DOE Defendants 1-15, including Defendants' deliberate indifference to Ms. Lines's health and safety. Defendants' conduct is therefore a "wrongful act" within the meaning California Code of Civil Procedure section 377.60. *See Estate of Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013).

113.   Defendants' negligence (in the form of failing to monitor and treat,

56

COMPLAINT

failing to summon medical care, failing to conduct adequate safety checks, and failing to implement adequate policies and training, etc.) provides the basis for Plaintiffs' wrongful death claims.

114. Defendants' tortious conduct – including both the negligent conduct and deliberate indifference to Ms. Lines's health and safety – was the proximate cause of her death, which was a direct and foreseeable result of that tortious conduct. As a result, Plaintiffs lost their wife and mother prematurely. They are entitled to compensatory damages in an amount to be proven at trial.

115. As a direct and foreseeable result of the conduct alleged above, leading to Ms. Lines's wrongful death, pursuant to California Code of Civil Procedure Section 377.60, Plaintiffs suffered, economically and non-economically, from the loss of their wife and mother. They have suffered and continue to suffer loss of love, society, companionship, comfort, care, guidance, protection, affection, financial support, moral support, and other services as a result of Ms. Lines' preventable death.

116. Each Defendants' breach of duty and failure to summon medical care or conduct the proper welfare and safety checks constituted contemptible conduct that would be looked down on and despised by reasonable people. Further, Defendants committed this misconduct with a willful and knowing disregard of, and deliberate failure to avoid, the probable dangerous consequences to Ms. Lines' health and safety. As a result, Plaintiffs seek punitive damages in an amount to be proven at trial against the individual defendants and the entity defendants, other than the County of San Diego. Code Civ. Proc. § 377.34(a).

117. Based on the intentional and/or gross negligent acts of each Defendant and DOE Defendants 1-15, and pursuant to California Government Code 815.2 and 815.6, the County, Naphcare, and CHP are vicariously liable for its employees' negligent and reckless conduct which was performed within the course and scope of their employment.

COMPLAINT

## XII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount according to proof;

2. For punitive and exemplary damages against each individually named Defendant in their individual capacity, and against Naphcare and CHP in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3. For reasonable costs, expenses, and attorney's fees pursuant to 42 U.S.C. sections 1988 and 12205, California Civil Code sections 52.1 et seq.; and 1021.5, and as otherwise authorized by statute or law; and

4. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## XV.

## REQUEST FOR JURY

Plaintiffs hereby request a jury trial in this action.

Respectfully submitted,

Dated: December 31, 2025

s/ Danielle Pena
s/ Grace Jun
Grace Jun, Esq.
grace@gracejunlaw.com
Attorney for Plaintiffs Estate of Callen Lines et al.

58

COMPLAINT